**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**F. Thomas LITTLE,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Peter CHERNIK, Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Harold GRUTCHFIELD,**
**Defendant-Appellant.**

Nos. 83–1021, 83–1026 and 83–1032.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 12, 1984.

Decided Oct. 26, 1984.

As Amended Feb. 15, 1985.

Deborah Wright Dawson, Washington, D.C., for plaintiff-appellee.

E.O.C. Ord, San Francisco, Cal., for defendants-appellants.

Before ALARCON, and CANBY, Circuit Judges, and STEPHENS *, District Judge.

* Honorable Albert Lee Stephens, Jr., Senior United States District Judge for the Central District of California, sitting by designation.

**ALARCON, Circuit Judge:**

In these three companion appeals, appellants F. Thomas Little, Peter R. Chernik, and Harold Grutchfield challenge their convictions for conspiracy to defraud the United States by impeding, impairing, obstructing and defeating the lawful function of the Internal Revenue Service and Department of Treasury in the collection of tax revenue, in violation of 18 U.S.C. § 371. Little, Chernik, and Grutchfield individually and jointly raise numerous issues on appeal. We affirm their convictions.

## FACTS

The indictment in this matter stemmed from an IRS undercover investigation of Indec Financial Inc. (Indec), a real estate development company that sold interests in real estate limited partnerships to investors. Little was the chairman of Indec's board of directors. Chernik, a member of the California bar, was Indec's legal counsel. Grutchfield was Indec's president. Peter Yost, who did not appeal his conviction, was a salesperson for Indec.[1]

The IRS investigation commenced on December 24, 1980, when IRS Special Agent Christopher White, posing as Charles Whitman, a representative for a group of investors looking for tax shelters, called Little at Indec regarding a possible investment in a tax shelter. White was referred to Yost. White discussed with Yost the possibility of providing a $200,000 tax shelter for calendar year 1980 for a wealthy client. White stated that he might not be able to contact his client until January 1981. Yost indicated that Indec could accept a check in January 1981. Yost scheduled a meeting with White in Indec's offices for December 29, 1980.

At the December 29 meeting, Yost explained Indec's investment and shelter programs. According to Yost, Indec had two types of investment programs: one was designed to make a profit and the other was designed to shelter income from taxation. Bedford & Company, a partnership in the Cayman Islands, was of the latter type.

Yost explained the Bedford partnership in detail and offered to sell White's client an interest in Bedford.

White again told Yost that he might have difficulty contacting his client before January 1981. Yost assured White that this would not be a problem. Yost explained that the client's entitlement to a tax deduction depended on his participation in the Bedford partnership prior to June 1, 1980. Because that critical date had already passed, a backdated subscription agreement and promissory note would be used to provide documentary proof that the client was a member of the partnership prior to the June 1, 1980 deadline. The partnership's records would then reflect that the client's 1981 check was a delinquent payment on the 1980 promissory note. Yost agreed with White that the client's accountant and attorneys should not be told of the backdated note. Before the December 29 meeting had ended, Yost gave White several documents, including a Bedford offering memorandum, a blank promissory note to Bedford, and a tax opinion letter regarding Bedford which bore Chernik's signature.

On January 12, 1981, White called Yost at Indec's offices to discuss the Bedford investment. Yost recommended that White's client participate in Bedford for three or four years to avoid scrutiny from the IRS. Yost repeated his explanation of the use of the backdated documents and reassured White that his client could take a deduction on his personal tax return for 1980, despite his becoming a member of the Bedford partnership until 1981. Yost further explained that the backdated promissory note would be used only for 1980. For subsequent years of participation in Bedford, White's client would be billed prior to June 1. Yost also emphasized that the IRS would be unable to subpoena Bedford's partnership records because they were maintained in the Cayman Islands.

White asked Yost to send him a sample of the documents used for filing the individual partners' personal tax returns and an outline of the mechanics of Bedford's

---

1. Peter Yost was tried with appellants. Yost was also convicted under 18 U.S.C. § 371.

investment plan. The copy of the tax schedule Yost sent to White differed from that which Yost had previously indicated should be used. During a subsequent telephone cnversation with Yost, White inquired into this discrepancy. Yost explained that there were some options as to which tax schedule could be used and he would later determine which one White's client should use to report the deduction from Bedford.

On January 22, White went to Indec's offices to pick up the written explanation of the Bedford investment program and a copy of the schedule his client was to use when filing his individual tax return. The receptionist gave White an envelope which contained an outline of Bedford's investment plan prepared by Yost and a copy of a schedule E tax form. While White was at Indec's offices, Little approached White and asked him if he had any questions regarding the investment in Bedford. White responded that he was confused about the mechanics of the investment and how it related to the Bedford offering memorandum. Little told White that the offering memorandum was for purposes of the IRS only. Little also explained that Bedford would prepare the information necessary for White's client to file his tax return. Little assured White that his client's privacy would be protected by a numerical filing system. The only documents which would link names to the numbers were secured by an accountant in the Cayman Islands.

On February 6, 1981, White and Special Agent Walter Perry, who posed as Vincenzo Paoli (Paoli), White's wealthy client, met with Yost, Little, and Chernik to discuss the Bedford investment plan. This and subsequent meetings and telephone conversations between IRS agents and Indec representatives were secretly recorded.

At the February 6 meeting, Little introduced Chernik as Indec's attorney and theorist. Little presented to White and Paoli an overview of Indec's investment programs. Little then elaborated on the specific mechanics of the Bedford partnership investment plan. Little explained that there was an interest in Bedford available for 1980, but in order for Paoli to take a 100% deduction Paoli would have to have entered the partnership before June 1, 1980. Little and Yost assured Paoli that a backdated promissory note would allow him to use Bedford as a deduction for his 1980 individual tax returns and that the IRS would not be able to dispute or disprove that he entered Bedford in May of 1980. Little and Yost also stated that they had successfully used the backdating procedure with other clients. Little advised Paoli not to inform his accountant of the true details of the Bedford deduction because accountants are not privileged. Chernik was present during Little's presentation of the Bedford partnership and explanation of the use of backdated documents.

During the course of the February 6 meeting, Little gave Paoli three copies of a blank subscription agreement and a promissory note to sign. Little encouraged Paoli to sign the Bedford partnership agreement so that he or Chernik could take these documents with them on their upcoming trip to the Cayman Islands. Paoli told the others that he had decided to leave the final decision whether to invest in Bedford up to White.

After the meeting concluded, Agent Perry initialed and signed the Bedford subscription agreements and the promissory note under his assumed name, Vincenzo Paoli. Perry gave the signed documents to White.

On February 9, White took the signed subscription and promissory note to Indec's offices. White told Yost and Little that he was uneasy about having to decide whether Paoli should invest in Bedford. Little and Yost reassured White that similar transactions had been successful in the past. Little again emphasized that the dates on the documents could not be disproved, absent a breach from one of the parties involved in the transaction. Little left the meeting and Yost continued speaking with White.

Yost showed White two client files containing backdated promissory notes and offered to contact one of these clients. The client told White that he was satisfied with the backdating method. Yost's client also told White that he had been given backdated dunning letters. Yost assured White that dunning letters could be provided to Paoli if he wanted them. Yost also emphasized the secrecy regarding the files on Paoli's investment in Bedford. White left Indec's office and later that evening called Yost to inform him that he had advised Paoli not to invest in Bedford.

On February 18, White returned Yost's call and briefly conversed with him. This was White's last contact with Indec personnel. The undercover operation was suspended for several months because of the unavailability of government funds for the investigation. IRS agents resumed the undercover investigation of Indec in August 1981.

On August 27, 1981, Agent Perry, acting as Paoli, called Yost and asked whether Indec still had any tax shelters available for 1980. Yost indicated that such a shelter was available and arranged a meeting for September 21.

On September 21, 1981, Paoli and another IRS special agent posing as Joe Russo, met with Yost, Little, Chernik, and Grutchfield at Indec's new office. Paoli then explained why he had not contacted Indec since February. Paoli stated that he had until October 15, 1981, to file his 1980 tax return.

Little asked Paoli if he needed any deductions for 1980 and Paoli replied that he could use $200,000 in deductions. Little and Grutchfield indicated that they had some writeoffs that were available. Little offered Paoli the same type of tax shelter in Bedford he had described to him in February. Little indicated that a backdated subscription agreement and promissory note would be used.

After Little left the September 21, 1981 meeting, Grutchfield, Chernik, and Yost explained to Paoli and Russo that the backdated promissory notes would document

Paoli's status as a partner in Bedford prior to June 1, 1980. They also agreed that fraudulent dunning letters could be placed in Paoli's file to document further his entry into the partnership prior to June 1, 1980. Grutchfield stressed that the letters would "make things look better" and that Paoli should not let the IRS learn of the backdating of the notes. Before the meeting ended, Paoli stated that he would accept the offer to invest in Bedford in order to take the investment as a writeoff on his 1980 returns. Paoli signed a promissory note which Yost had backdated to May 21, 1980. Russo asked that dunning letters be provided.

On October 7, Paoli and Russo met with Yost, Little, Grutchfield, and Chernik in Little's office at Indec in order to conclude the Bedford transaction. At the meeting, Little gave Russo four fraudulent dunning letters. Russo then paid Little for the interest in Bedford by placing a cashier's check for $100,000 on his desk. As the group prepared to celebrate the conclusion of the transaction with champagne, several IRS special agents entered the office. Some agents arrested Yost, Grutchfield, and Little in Little's office. Other agents arrested Chernik in Indec's reception area. The agents took Yost, Grutchfield, Little, and Chernik to San Francisco for arraignment.

A team of special agents remained at Indec's offices from the time of the arrest on October 7 through shortly after noon on October 8. The parties dispute whether the agents searched the office.

## DISCUSSION

### I. *Legality of the Retroactive Allocation*

#### A. *IRS Statutes and Regulations*

■ Appellants urge us to reverse their convictions for conspiracy to defraud the government on the ground that the retroactive allocation to Paoli of Little's and Grutchfield's shares of the Bedford partnership losses was legal. They contend that the interplay between 26 U.S.C.

§§ 704(a), 761(c) and 6031,[2] as they read it at the time of the Bedford transaction, permitted the retroactive allocation to a new partner of partnership losses attributable to periods prior to the new partner's entry into the partnership. Specifically, they contend that pursuant to these code sections and respective regulations, Bedford's partnership agreement could have been amended at any time prior to October 15, 1981, to effect a legal retroactive allocation of Little's and Grutchfield's shares of Bedford's 1980 losses to Paoli. Appellants are wrong. Their tortured interpretation of the pertinent statutes and legislative history does not withstand scrutiny.

Appellants and the government agree that 26 U.S.C. § 706(c)(2)(A), which governs the sale of a partner's entire interest in a partnership, applies to the transaction in this case. Section 706(c)(2)(A) provides in relevant part:

> The taxable year of a partnership shall close—
>
> (i) with respect to a partner who sells or exchanges his entire interests in a partnership, and . . .
>
> Such partner's distributive share of items described in section 702(a) for such year shall be determined, under regulations prescribed by the Secretary, for the period ending with such sale, exchange, or liquidation.

The pertinent regulation, 26 C.F.R. § 1.706–1(c)(2)(ii), provides that when a partner sells his or her entire interest, the partnership's taxable year closes with respect to that partner on the date of the sale, and the transferor partner must re-port his or her share of the partnership's gains or losses attributable to the period prior to the sale. The transferee partner must report his or her share of the partnership's gains or losses attributable to the period after the sale. *See* 1 McKee, Nelson and Whitmire, *Federal Taxation of Partnerships and Partners* §§ 11.02[3], [4][a], 5[a] at 11–6 to 11–11 (1977 ed.); 2 Willis, Pennell, and Postlewaite, *Partnership Taxation* § 87.04 at 87–10 (3rd ed. 1981).

In *Moore v. Commissioner*, 70 T.C. 1024 (1978), although the issue before the court involved retroactive allocations under 26 U.S.C. § 706(c)(2)(B), the tax court expressly noted that 26 U.S.C. § 706(c)(2)(A) and 26 C.F.R. § 1.706–1(c)(2)(ii), require a partner who transfers his entire interest to report his distributive share of partnership items for the period he was a partner. The court emphasized that the partner could not transfer retroactively those items to the transferee by modifying the partnership agreement under 26 U.S.C. § 761(c). *Id.* at 1031. In light of the express language in *Moore*, retroactive allocations in situations governed by 26 U.S.C. § 706(c)(2)(A) cannot be legally accomplished by amending the partnership agreement under 26 U.S.C. § 761(c).

*Smith v. Commissioner*, 331 F.2d 298 (7th Cir.1964), is not to the contrary. *Smith* involved the sale of an entire partnership interest between two *existing*, equal partners. Although the sale occurred in the middle of the partnership's taxable year, the partners amended the partnership agreement, at the time of the

---

**2.** 26 U.S.C. § 704(a) provides:

A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this chapter, be determined by the partnership agreement.

26 U.S.C. § 761(c) provides:

For purposes of this subchapter, a partnership agreement includes any modifications of the partnership agreement made prior to, or at, the time prescribed by law for the filing of the partnership return for the taxable year (not including extensions) which are agreed to by all the partners, or which are adopted in such other manner as may be provided by the partnership agreement.

26 U.S.C. § 6031 (1981) provided:

Every partnership (as defined in section 761(a)) shall make a return for each taxable year, stating specifically the items of its gross income and the deductions allowable by subtitle A, and such other information for the purpose of carrying out the provisions of subtitle A as the Secretary may by forms and regulations prescribe, and shall include in the return the names and addresses of the individuals who would be entitled to share in the taxable income if distributed and the amount of the distributive shares of each individual.

Section 6031 was amended in 1982.

sale, to allocate substantially all of the fiscal year's gains and losses to the purchasing partner.

After finding that there was no evidence that the partners modified the partnership agreement in order to avoid or evade taxes, the Seventh Circuit concluded that the retroactive allocation of the partnership income was proper. *Smith* clearly does not support the proposition urged by appellants—that retroactive allocations to *new* transferee partners in § 706(c)(2)(A) situations are allowed. *See also Rodman v. Commissioner*, 542 F.2d 845, 857–58 (2nd Cir.1976). (The Second Circuit distinguished cases such as *Smith* where existing members of an ongoing partnership agreed to rearrange shares retroactively from cases where a *new* partner has joined the partnership by a transfer of partnership interest. The Second Circuit found that retroactive reallocation where a new partner has joined the partnership was prohibited. The Second Circuit also concluded that when one partner sold his entire interest to the remaining three partners, "the partnership year closed as to him and his distributive shares ... were set as of that moment.")

In 1976, Congress amended 26 U.S.C. § 706(c)(2)(B) in order to make clear that retroactive allocations were not permitted where new partners entered into a partnership by contribution or acquisition of less than the entire interest of an existing partner. Appellants contend that because the 1976 amendments did not affect § 706(c)(2)(A), retroactive allocations continued to be permissible under the latter section. They assert that if Congress had wanted to bar retroactive allocations under § 706(c)(2)(A), it would have done so under the 1976 Tax Reform Act. This argument is based on appellants' unreasonable and erroneous contention that retroactive allocations were permissible under § 706(c)(2)(A).

A reading of the legislative history of the 1976 amendment to § 706(c)(2)(B), clearly indicates that Congress was aware that retroactive allocations were not permissible under § 706(c)(2)(A). In explaining the reasons for the amendment to § 706(c)(2)(B), the committee reports: "Present law is not clear whether retroactive allocations are permissible under the Internal Revenue Code. Essentially, there are four partnership Code provisions which have a direct or indirect bearing on this issue—sections 704(a), 761(c), 704(b)(2), and 706(c)(2)(B)." H.R.Rep. No. 658, 94th Cong., 1st Sess.; S.Rep. No. 938, 94 Cong., 2d Sess.; *reprinted in* 1976 U.S.Code Cong. & Ad. News 2897, 3017 & 3531. The omission of § 706(c)(2)(A) from this enumeration was not an oversight by Congress. Congress emphasized that it was amending § 706(c)(2)(B) to *clarify* that retroactive allocations were not permitted under this section and to make it *consistent* with the requirements of § 706(c)(2)(A) and its respective regulation, 26 C.F.R. § 1.706-1(c)(2)(ii). *Id.* at 3018–19 & 3532–34. Specifically, the committee report states:

> The bill amends present law (sec. 706(c)(2)(B)) to make it clear that the varying interests rule of this provision is to apply to any partner whose interest in a partnership is reduced, whether by sale, exchange, or otherwise, such as by the admission of a new partner who purchased his interest directly from the partnership. Correspondingly, the provision is to apply to the incoming partner so as to take into account his varying interests during the year. *In addition, regulations are to apply the same alternative methods of computing allocations of income and loss to situations falling under section 706(c)(2)(B) as that currently provided with respect to section 706(c)(2)(A) situations (sale or liquidation of an entire interest).*

*Id.* at 3019 (emphasis added); *see also id.* at 3533–34. The purpose of the amendment to § 706(c)(2)(B) was not to modify the existing law, as appellants suggest, but to clarify it so that it would be applied consistently. *See Richardson v. Commissioner*, 76 T.C. 512, 523–24 (1981), *aff'd*, 693 F.2d 1189 (5th Cir.1982).

The legislative history of the 1976 Tax Reform Act clearly indicates that Congress did not amend § 706(c)(2)(A) to bar retroactive allocations because there was no need to do so. Retroactive allocations to *new* partners were *not* permitted under that section.

Furthermore, the legislative history of the 1976 Tax Reform Act also refutes appellants' assertion that the interplay between 26 U.S.C. §§ 704(a) and 761(c) allows for retroactive allocation in § 706(c)(2)(A) situations. Congress noted that this same argument had been made in order to circumvent the prohibition against retroactive allocations under § 706(c)(2)(B). To reinforce the prohibition against retroactive allocations, Congress amended § 704(a). The committee report states:

> In addition, the present law provision relating to the effect of a partnership agreement (sec. 704(a)) is amended to provide that it is overridden by any contrary provisions of the partnership provisions (under subchapter K, including section 706(c)(2)(B)). Thus, a partnership agreement, amended (pursuant to section 761(c)) to provide for a retroactive allocation, will not override an allocation required under section 706(c)(2)(B).

1976 *U.S.Code Cong. & Ad.News* at 3020; *see also id.* at 3534.

Section 704(a) was amended to read: "A partner's distributive share of income, gain, loss, deduction or credit shall, except as otherwise provided in this *chapter*, be determined by the partnership agreement" (emphasis added). Congress thereby made clear that a partnership agreement amended pursuant to § 761(c) could not override an allocation required under § 706(c)(2)(B). *Id.* at 3020 & 3534. *See Marriott v. Commissioner,* 73 T.C. 1129 (1980); *Moore v. Commissioner,* 70 T.C. 1024 (1978).

This amendment to § 704(a) also resolved any doubt regarding § 706(c)(2)(A). A partnership agreement amended pursuant to § 761(c), would not override the allocation mandated by § 706(c)(2)(A).

In sum, at the time of the initiation of the Bedford deal on December 24, 1980, the allocation rule set forth in § 706(c)(2)(A), as interpreted by case law and clearly reflected in the pertinent legislative history, was and remains mandatory. The requirements of § 706(c)(2)(A) cannot be circumvented by modifying the partnership agreement under § 761(c).

### B. *Jury Instructions*

Closely related to appellants' claim that retroactive allocation was allowed under 26 U.S.C. § 706(c)(2)(A), is their challenge to the district court's jury instructions. Appellants argue that the district court committed reversible error by: (1) failing to give some of the joint and individual instructions they requested, (2) giving some of the government's instructions, and (3) deleting parts of some of the government's instructions.

Initially, we note that a trial judge is given substantial latitude in tailoring jury instructions as long as they fairly and adequately cover the issues presented. *United States v. Marabelles,* 724 F.2d 1374, 1382–83 (9th Cir.1984). In *United States v. Smith,* 735 F.2d 1196 (9th Cir. 1984), this court recently reiterated the standard of review we apply to challenges to jury instructions. "The adequacy of a judge's instructions to the jury is measured by reading the instructions as a whole. The judge's formulation of those instructions or his choice of language is entirely in his discretion, so long as the instructions fairly and adequately cover the issues presented." *Id.* at 1198 (citation omitted).

Our review of the jury instructions in this case, convinces us that there was no abuse of discretion. The district court instructed the jury as follows:

> Now the law provides that a taxpayer who is in a partnership shall take into account his share of the partnership losses for the taxable year, or portion thereof, in which he is a partner in determining his individual taxable income. However, the law prohibits a partner from taking into account, in determining his individual taxable income, a share of the

partnership losses for a taxable year, or a portion thereof, prior to his admission into the partnership.

In evaluating the presence or absence of specific intent, you may consider, together with all the other evidence in the case, the circumstance that no decided case directly and precisely construes the legality of a transaction such as that alleged to be the substance of the alleged conspiracy in this case.

If a partner sells or exchanges his entire partnership interest, the partnership's taxable year closes, with respect to him, on the date of the sale or exchange. The date selected by the parties should control provided the benefits and burdens shift on that date.

The law permits the modification of a partnership agreement which is agreed to by all the partners or as modified in any manner which is provided to the partnership agreement with respect to any taxable year of the partnership until the date prescribed by law for filing of a partnership tax return for such taxable year, and the law as of October 7, 1981, provided that a partnership need not file any partnership tax return for any year in which the partnership carried on no business in the United States, and derived no income from sources within the United States.

Now if you find that a defendant reasonably believed that the sale or assignment of his entire partnership interest in 1981, after the close of the calendar year 1980, was permissible under the Internal Revenue Code, even if the transaction was not valid under the Internal Revenue Code, then such a defendant cannot have entertained the required specific intent under the conspiracy law, and is entitled to acquittal.

■ The district court's instructions gave an accurate statement of the applicable law and accommodated the appellants'

defense theory that they reasonably believed that the proposed Bedford transaction was legal.[3]

### C. Reliance on Dahlstrom

Appellants contend that reversal of their convictions is required in light of this court's opinion in *United States v. Dahlstrom,* 713 F.2d 1423 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984). Appellants' reliance on *Dahlstrom* is misplaced.

The defendants in *Dahlstrom* were convicted of conspiracy to defraud the government by impeding, impairing, and obstructing the IRS in the ascertainment, computation, assessment and collection of income taxes and of aiding and abetting the preparation of false returns because of their involvement in promoting a tax shelter program which involved the creation of a foreign trust organization. The court concluded that reversal of the defendants' convictions was required on several grounds.

First, we emphasized that "[d]ue process requires that a person be given fair notice as to what constitutes illegal conduct so that he may conform his conduct to the requirements of the law." *Id.* at 1427. In *Dahlstrom,* on the dates alleged in the indictment, there was no statute that expressly made illegal the type of tax shelters promoted by the defendants nor was there any case law which held that defendants' scheme lacked economic substance for tax purposes. Thus, the defendants could not have had "fair notice" that their conduct was illegal. Second, the court noted that where a defendant is not given fair notice of the requirements of the law, a defendant necessarily lacks the requisite intent to violate the law.

■ In the present case, as discussed above, the law regarding the legality of retroactive allocations under § 706(c)(2)(A)

---

**3.** We note that the substance of some of the instructions which appellants claim should have been given were in fact presented to the jury. Appellants proffered instructions which were not presented to the jury were: (1) irrelevant;

(2) misstated the law; (3) not supported by the evidence; (4) inappropriate attempts to influence the jury; or (5) matters within the province of the jury. The district court properly rejected these instructions.

was clear on the dates alleged in the indictment. Case law and relevant legislative history made plain that the retroactive allocation to a new partner of partnership losses attributable to periods prior to the new partner's entry into the partnership was impermissible. Appellants had fair notice of the law and they could have conformed their conduct to the requirements of the law. Thus, they could have had the requisite intent to violate the law.

Because the law regarding retroactive allocations of a partner's interest in a partnership was clear and appellants had fair notice as to what constituted illegal conduct, we also reject appellants' contention that their convictions violated their due process rights or the constitutional prohibition against ex post facto laws.

■ Appellants also rely heavily on *Dahlstrom* to support their assertion that the prosecution violated their first amendment rights of commercial free speech. In *Dahlstrom,* this court noted that the first amendment barred prosecution for advocacy of conduct which did not violate existing law. Unlike *Dahlstrom,* the record in this case indicates that the appellants' conduct was prohibited by existing law. Appellants encouraged Paoli to enter into the Bedford partnership so he could deduct from his personal return losses to which he was not entitled. They developed and presented a scheme as to how Paoli could retroactively declare the losses on his 1980 tax return. They supplied Paoli with backdated and fraudulent documents which would substantiate the claimed deductions in the event of an IRS audit, and told him they

had used the backdating scheme in the past. Appellants' conduct consequently went far beyond advocacy and amounted to participation in unlawful action. Appellants cannot cloak their intentional misconduct under the protections of the first amendment.

### II. *Suppression Claims*

### A. *Tape Recordings*

Relying on *People v. Conklin,* 12 Cal.3d 259, 114 Cal.Rptr. 241, 522 P.2d 1049, *appeal dismissed,* 419 U.S. 1065, 95 S.Ct. 652, 42 L.Ed.2d 661 (1974), appellants contend that the tape recordings of the conversation between the IRS undercover agents and appellants violated their fourth amendment rights and Cal.Penal Code § 632, which prohibits electronic eavesdropping without the consent of all the parties to the communication.[4] Therefore, appellants argue that the district court should have suppressed the tapes. We have previously considered and rejected such arguments. We do so again.

■ In this circuit, the rule regarding admissibility of evidence in a federal prosecution is clear and simple. Evidence obtained in violation of neither the Constitution nor federal law is admissible in federal court proceedings *without regard to state law.* See *United States v. Adams,* 694 F.2d 200, 201–02 (9th Cir.1982), *cert. denied,* 462 U.S. 1118, 103 S.Ct. 3085, 77 L.Ed.2d 1347 (1983) (*citing United States v. Hall,* 543 F.2d 1229, 1234–35 (9th Cir. 1976) (en banc), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977); *United States v. Keen,* 508 F.2d 986, 989 (9th

---

**4.** Cal.Penal Code § 632 provides in relevant part:

Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records such confidential communication, whether such communication is carried on among such parties in the presence of one another or by means of a telegraph, telephone or other device, except a radio, shall be punishable by fine not exceeding two thousand five hundred dollars ($2,500), ... or by imprisonment in the state prison, or by both

such fine and imprisonment in the county jail or in the state prison. If such person has previously been convicted of a violation of this section or Section 631 or 636, he is punishable by fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the county jail not exceeding one year, or by imprisonment in the state prison, or by both such fine and imprisonment in the county jail or in the state prison.

However, Cal.Pen.Code § 633 expressly exempts state law enforcement officers from the proscriptions of § 632.

Cir.1974), *cert. denied*, 421 U.S. 929, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975)).

■ The tape recordings in the present case were not obtained in violation of the fourth amendment. *See United States v. White*, 401 U.S. 745, 751–53, 91 S.Ct. 1122, 1125–27, 28 L.Ed.2d 453 (1971). The fourth amendment does not afford protection to wrongdoers' misplaced confidences. *Hoffa v. United States*, 385 U.S. 293, 302, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966). Nor were the tape recordings obtained in violation of federal law. Under 18 U.S.C. § 2511(2)(c), the tape recordings were lawful and, thus, were admissible under federal law. 18 U.S.C. § 2517(3).

■ We also reject the attempt by appellants to bypass this clear rule by invoking the supervisory power of the district court. The supervisory power is to be applied with caution when the result of its application would be to exclude probative evidence. *See United States v. Payner*, 447 U.S. 727, 734–35, 100 S.Ct. 2439, 2445–46, 65 L.Ed.2d 468 (1980). We decline to apply it here, where there has been no outrageous conduct by the agent and no violation of any appellants' federal rights.

B. *18 U.S.C. § 3109*

Appellants argue that the IRS agents violated the "knock and notice" requirement of 18 U.S.C. § 3109, by failing to give notice of their authority and purpose prior to arresting the appellants in Indec's office. Appellants contend that "all evidence obtained" from their arrest and subsequent search of Indec's offices must be suppressed. The government asserts, and appellants do not refute, that the only post-arrest evidence introduced at trial were statements made by Yost and Chernik.

■ Appellants cannot complain about the introduction of Yost's statements. The district court carefully instructed the jury to consider Yost's statements only against him. Moreover, appel-

lants may not vicariously assert Yost's fourth amendment rights. *See Rakas v. Illinois*, 439 U.S. 128, 138, 99 S.Ct. 421, 427, 58 L.Ed.2d 387 (1978); *Alderman v. United States*, 394 U.S. 165, 171–72, 89 S.Ct. 961, 965–66, 22 L.Ed.2d 176 (1968). Accordingly, we need only concern ourselves with the post arrest statements made by Chernik.[5]

■ Under 18 U.S.C. § 3109, a federal officer may break open "any outer or inner door" to execute a search warrant if after notice of authority and purpose, entrance is refused. This section also applies to an arrest, with or without a warrant, by a federal officer for a federal offense. *Sabbath v. United States*, 391 U.S. 585, 588, 88 S.Ct. 1755, 1757, 20 L.Ed.2d 828 (1968); *United States v. Crawford*, 657 F.2d 1041, 1044 (9th Cir.1981).

■ The enforcement of section 3109 serves three interests: (1) it provides protection from violence, assuring the safety and security of both the occupants and the entering officers; (2) it protects an individual's right to privacy; and (3) it protects against the needless destruction of private property. *United States v. Bustamante-Gomez*, 488 F.2d 4, 9–10 (9th Cir.1973), *cert. denied*, 416 U.S. 970 (1974).

Here, the IRS agents conceded that they did not knock and announce their presence or purpose before entering Indec's office. In light of this concession and by allowing Chernik's statements into evidence, the district court must have determined that § 3109 was inapplicable to the agents entry into Indec's offices. We limit our review to the entry into the reception area. Whether we review the district court's determination under the clearly erroneous standard, or under the de novo standard, we conclude that the district court was correct.

■ The IRS agents entered Indec's reception area through an unlocked door during business hours. Chernik was in Indec's reception area when the agents arrested

---

5. Only Chernik may challenge the introduction of his post-arrest statements into evidence. The district court allowed his statements into evi-

dence but cautioned the jury that they were to be considered against him only.

him. A reception area is used for purposes of greeting and screening those who enter an office to determine if the individual is properly there. Also, office workers are generally free to walk through this area. Since the public and office workers are allowed to walk freely into a reception area, an individual working in the office can have no reasonable expectation of privacy there. Accordingly, section 3109 does not apply to Indec's reception area.

Appellants cite *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); and *United States v. Phillips,* 497 F.2d 1131 (9th Cir.1974), in support of their claim that § 3109 should apply to this situation. Appellants' reliance on these cases is misplaced. Neither *Wong Sun* nor *Lo-Ji Sales, Inc.,* involved § 3109. The issue before the court in *Wong Sun* was whether the police had probable cause to arrest the defendants. In *Lo-Ji Sales, Inc.,* the Supreme Court did not address the propriety of the police officer's *entry* into an adult bookstore during business hours to effectuate a search warrant. The issue in *Lo-Ji* was the sufficiency of an affidavit and search warrant to seize certain items once the officers were on the business premises.

*United States v. Phillips,* is factually distinguishable. *Phillips* involved a nocturnal entry into a locked, occupied business. In concluding that § 3109 applied to such an entry, this court emphasized that "a locked commercial establishment, at least at night, is a 'house' as that word is used in § 3109." 497 F.2d at 1133–34.

## C. *Unlawful Search of Indec*

Appellants also argue that "all fruits" of the IRS agents' search of Indec's offices should have been suppressed. We agree with the government that we need not reach this issue. Other than the post-arrest statements of Yost and Chernik, which we have discussed above, none of the alleged fruits of the search and seizure of Indec's offices was introduced into evidence at appellants' trial.

## III. *IRS Authority for Undercover Investigation and Government Misconduct*

Appellants contend that reversal of their convictions is required because the IRS agents acted beyond their statutory authority in conducting the undercover investigation and committed numerous instances of alleged misconduct. We reject both of these contentions.

### A. *IRS Authority to Conduct Undercover Investigation*

 Appellants contend that the IRS agents exceeded their statutory authority by conducting the undercover investigation and therefore the entire investigation must be ruled void and unlawful. Appellants fail to cite any case which directly supports their contention that IRS undercover criminal investigations exceed the IRS's statutory authority. Our review of the relevant statutes convinces us that the IRS undercover criminal investigations such as the investigation in this case are well within the broad authority Congress delegated to the agency.

Under 26 U.S.C. § 6301, Congress granted the IRS broad authority to collect taxes. Congress also gave the IRS a broad mandate to investigate all persons who may be liable for any internal revenue tax, 26 U.S.C. § 7601, and broad discretion in determining what "reasonable devices or methods" may be "necessary or helpful" in collecting revenue tax. 26 U.S.C. § 6302(b). Under 26 U.S.C. § 7608(b), Congress granted police powers to IRS criminal investigators. These statutory grants of authority are clearly broad enough to encompass undercover criminal investigations which may be necessary and proper to the determination and collection of taxes, and to the general enforcement of the revenue laws.

Furthermore, the Supreme Court has recognized that in order to apprehend individuals engaged in criminal activities, the

government is entitled to use decoys and to conceal the identity of its agents. *Lewis v. United States,* 385 U.S. 206, 208–09 & n. 5, 87 S.Ct. 424, 425–26 & n. 5, 17 L.Ed.2d 312 (1966). Indeed the Supreme Court expressly stated that "there are circumstances when the use of deceit is the only practicable law enforcement technique available." *United States v. Russell,* 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973) (rejecting entrapment defense where undercover agent supplied defendant with chemical necessary to manufacture illegal drug). This case, where the collection of taxes is being impeded by fraudulent conduct, presents such circumstances. *See, e.g., United States v. Everett,* 692 F.2d 596 (9th Cir.1982), (IRS undercover investigation revealed defendants' scheme to sell tax shelter investments that had been backdated to allow buyers to claim deductions on their federal income tax returns for the years prior to those in which transaction actually occurred).

Appellants' contention that the IRS agents' undercover investigation in this case was prohibited by 26 U.S.C. § 7214(a)(4), (a)(5) and (a)(6), is patently frivolous.[6]

The agents' conduct was simply part of their undercover role. Were we to accept appellants' contention that the agents' conduct violated § 7214 we would, in effect, be barring undercover investigations in which a federal agent must pretend and appear to violate the law. Clearly, Congress could not have intended such a rule in enacting § 7214. Moreover, even if the IRS agents violated § 7214, the remedy lies not in freeing appellants, but in prosecuting the agents. *See Hampton v. United States,* 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976).

Because the IRS agents acted within their authority in conducting the undercover investigation, we also reject appellants' argument that the undercover investigation violated appellants' due process rights.

### B. *IRS Agent Misconduct*

Appellants allege numerous instances of misconduct by the IRS agents which appellants claim require reversal of their convictions, either under the due process clause or this court's supervisory powers. Our review of the record convinces us that none of the allegations of government misconduct requires reversal.

#### 1. *Affirmative Misrepresentation by IRS Agent Perry*

■ Appellants argue that the district court should have suppressed the tapes of all of the conversations between appellants and the IRS agents occurring after August 24, 1981, because they were secured by "fraud, deceit and trickery." Their argument is based on Agent Perry's denial to an Indec receptionist that he was with the IRS. Appellants assert that Perry had a duty to answer truthfully when questioned about his affiliations. Appellants further contend that if Agent Perry had answered truthfully, they would have terminated their dealings with the IRS agents.

Appellants fail to cite any cases holding that an *undercover agent* is under an affirmative duty to respond truthfully if questioned about his or her true identity. The cases relied on by appellants all involve government agents—*known* by the sus-

---

**6.** 26 U.S.C. §§ 7214(a)(4), (a)(5) and (a)(6) provide:

> Any officer or employee of the United States acting in connection with any revenue law of the United States—
>> (4) who conspires or colludes with any other person to defraud the United States; or
>> (5) who knowingly makes opportunity for any person to defraud the United States; or
>> (6) who does or omits to do any act with intent to enable any other person to defraud the United States; ...

shall be dismissed from office or discharged from employment and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both. The court may in its discretion award out of the fine so imposed an amount, not in excess of one-half thereof, for the use of the informer, if any, who shall be ascertained by the judgment of the court. The court also shall render judgment against the said officer or employee for the amount of damages sustained in favor of the party injured, to be collected by execution.

pects to be agents—who through deceit, trickery or misrepresentation abused the powers of their position to gain access to a private citizen's premises or records.[7] The rule set forth in those cases is that access gained by a government agent, known to be such by the person with whom the agent is dealing, violates the fourth amendment's bar against unreasonable searches and seizures if such entry was acquired by affirmative or deliberate misrepresentation of the nature of the government's investigation. This rule is inapplicable to cases, such as the present, involving an *undercover* agent's denial that he or she is a federal agent.

In *Jones v. Berry,* 722 F.2d 443 (9th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 2343, 80 L.Ed.2d 817 (1984), we recognized that cases such as those relied on by appellants are readily distinguishable from situations such like the present, where "IRS agents did not pretend to be civil agents, thereby implicitly invoking their powers as civil investigators, when in fact they intended to conduct a criminal investigation. Rather, the agents pretended to be fellow criminals in order to gain the [suspect taxpayer's] confidence." *Id.* at 447 n. 5.

The undercover agent's denial of association with the government is justifiable and necessary to protect the agent's "cover." Were we to accept appellants' theory, we would, in effect, put an end to federal undercover operations by imposing a duty on federal undercover agents to identify themselves as such whenever they are asked. To insure themselves against convictions based on evidence obtained through undercover investigations, criminals would only have to ask their acquaintances and associates if they were government agents. We reject appellants' fanciful theory.

### 2. *Witness Intimidation*

■ Appellants allege that the IRS intimidated their expert witness into not testifying on surrebuttal. They contend that this alleged government misconduct amounted to a denial of their due process rights.[8] Appellants also urge us to apply our supervisory powers to reverse the conviction and to order the district court to dismiss the indictment.

■ In support of their claim of witness intimidation, appellants rely on a line of cases which support the proposition that substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process. *See Webb v. Texas,* 409 U.S. 95, 97–98, 93 S.Ct. 351, 353–354, 34 L.Ed.2d 330 (1972) (defense witness intimidated into not testifying by remarks of trial judge); *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967) (right to present witness to establish defense is fundamental to due process);

---

7. Appellants cite *United States v. Ward,* 576 F.2d 243 (9th Cir.1978); *United States v. Robson,* 477 F.2d 13, 17 (9th Cir.1973); *Goodman v. United States,* 369 F.2d 166 (9th Cir.1966), suppression granted on remand, 285 F.Supp. 245, 252 (C.D.Cal.1968); *SEC v. ESM Government Securities, Inc.,* 645 F.2d 310, 315–17 (5th Cir.1981); and *United States v. Tweel,* 550 F.2d 297 (5th Cir.1977).

8. On appeal, appellants urge reversal on due process grounds because of the alleged witness intimidation. They now argue that once a showing of government interference is demonstrated, reversal is required without regard to any prejudice to the defendant. Appellants argue that this standard should be applied to them.

In their motion to dismiss, however, appellants attempted to invoke the court's supervisory powers. Appellants recognized that in order to prevail they must show some prejudice to them flowing from the alleged misconduct. *See United States v. Owen,* 580 F.2d 365, 367 (9th Cir.1978). They also acknowledged that this court will invoke its supervisory power to dismiss an indictment for·flagrant prosecutional misconduct only where there is a clear basis in law and fact, and when necessary for the preservation of the integrity of the judicial process. *United States v. Rasheed,* 663 F.2d 843, 853 (9th Cir.1981), *cert. denied sub nom.,* 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982).

We need not reconcile this discrepancy in appellants' argument because we agree with the district court that a simple, investigatory phone call does not amount to misconduct or witness intimidation.

*United States v. Goodwin,* 625 F.2d 693, 703 (5th Cir.1980); and *United States v. Hammond,* 598 F.2d 1008, 1012–15 (5th Cir.1979) (defense witnesses intimidated by FBI agent during court recess and by subpoena to appear before a grand jury); *United States v. Henricksen,* 564 F.2d 197, 198 (5th Cir.1977) (defense witness intimidated by terms of codefendant's plea bargain); *United States v. Morrison,* 535 F.2d 223, 226–28 (3rd Cir.1976) (defense witness intimidated by prosecutor's remarks); *United States v. Thomas,* 488 F.2d 334, 335–36 (6th Cir.1973) (defense witness intimidated by remarks of secret service agent during court recess). Whether substantial government interference with a defense witness occurred is a factual determination to be made by the trial court. *See United States v. Goodwin,* 625 F.2d at 703; *United States v. Bates,* 600 F.2d 505, 511 (5th Cir.1979). We review a district court's factual determination under the clearly erroneous standard.

The testimony adduced at the lengthy hearing on the motion to dismiss held on the witness intimidation claim revealed the following pertinent facts. On October 6, 1982, the government learned that the following day appellants would call as an expert witness Richard Losey, a law school professor and practitioner specializing in tax law. Losey was to testify in support of appellants' theory regarding the legality of the retroactive allocations under 26 U.S.C. § 706(c)(2)(A). Prosecution attorneys became curious about Losey's relationship with Chernik. An IRS special agent offered to inquire into the matter.

On the morning of October 7, the special agent called the IRS office and asked whether anyone had information regarding Losey. The special agent's supervisor instructed another agent to call Losey's office and gather some information.

The agent called Losey's office, identified himself as "Mr. Jacobs," and asked for Chernik. A secretary informed the agent that no one by that name worked at the firm. The agent asked the secretary if Chernik was a partner at the firm. The secretary responded that he was not. The agent also asked the secretary if Losey and Chernik were on the faculty at the same law school. The agent told the secretary that he had been referred to the firm by a friend of Chernik. The agent then made further inquiries into the firm's practice. Before ending the conversation, the agent left a number where Losey could return the call.

Losey stated that his secretary informed him about the peculiar call on the morning of October 8, the day after he testified as an expert. Losey claimed that he was chilled by the suspicious phone call because he suspected government involvement. Losey immediately informed one of the defense counsel of the call and told him he would not "feel like one hundred percent" on the stand. Losey further testified that when it was confirmed that the caller was from the IRS, he felt intimidated and feared reprisals. Thus, Losey asserted that the call affected his decision whether to testify on surrebuttal.

Losey also testified, however, that the source of the call was not confirmed until the evening of October 11. Losey testified that he was told by one of the defense counsel on October 9 that the defense lawyers had reached a consensus not to have him testify on surrebuttal.

Counsel for appellant Grutchfield testified that he wanted Losey to testify on surrebuttal on the "international tax law aspects" of the case. Counsel decided against calling Losey to the stand after he confirmed the caller's true identity because he believed Losey was too nervous.

 We may infer from the district court's denial of the motion to dismiss based on appellants' witness intimidation claim that the district court found that there was no government misconduct. The district court expressly noted that a simple phone call to investigate the connection between Losey and Chernik did not amount to intimidation. We agree with the district court.

The only evidence of "intimidation" presented by appellants was a telephone call made by an IRS agent to Losey's office. The purpose of the call was to investigate into the relationship between Losey and Chernik. We note that there is nothing improper with investigation of trial witnesses. Indeed, such investigations are often necessary to collect information for cross-examination or impeachment purposes. A telephone call is an appropriate means to conduct such an investigation. In this case, the fact that the IRS agent who placed the call to Losey's office concealed his true identity does not amount to government misconduct.

We also note that there was no evidence presented that the IRS made the call in order to intimidate Losey.[9] Moreover, although Losey testified that the call made him nervous, he never stated that he would not testify if called on surrebuttal. On these facts, we cannot find any evidence of witness intimidation by the government. Thus, our review of the record convinces us that the district court's finding on the witness intimidation claim was not clearly erroneous and that the district court properly denied the motion to dismiss.[10]

### 3. Alleged CIA Involvement

■ Appellants argue that their convictions should be reversed because the Central Intelligence Agency was involved in the IRS's investigation of Indec and its personnel. Alternatively, appellants seek a remand of this case for a hearing on the alleged CIA involvement.

After a closed hearing on appellants' motion for dismissal of the indictment based on alleged CIA involvement in this case, the district court rejected appellants' claim of CIA involvement and denied the motion to dismiss. The transcript of this hearing was submitted under seal to this court. Our review of the transcript convinces us

that the district court properly rejected the claim of CIA involvement and denied the motion to dismiss.

On appeal, appellants continue to insist that the CIA was involved in this case. Appellants have attempted to prove their allegation through the numerous documents lodged with this court. The documents submitted by appellants are wholly outside the record properly before this court. We must limit our review of appellants' claim to the record that was made before the trial court. See Fed.R.App.P. 10(a); Retana v. Apartment, Motel, Hotel & Elevator Operators Union, 453 F.2d 1018, 1027 (9th Cir.1972).

### 4. Brady Material

Appellants further assert that the government's failure to provide them with the purportedly exculpatory statements of Arnoldo Rodriguez mandates reversal of their convictions under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Alternatively, appellants contend that reversal is required because the government perpetuated a fraud on the court. We find no Brady violation or fraud upon the court in this case.

■ Under Brady, the prosecution may not suppress exculpatory evidence that is material to the issue of guilt or punishment. Id. at 87, 83 S.Ct. at 1196. In a case, such as the present, where a general request for exculpatory evidence is made, "the test for materiality is whether the suppressed evidence 'creates a reasonable doubt that did not otherwise exist.'" United States v. Gardner, 611 F.2d 770, 774 (9th Cir.1980) (quoting United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976); accord United States v. Cadet, 727 F.2d 1453, 1467–68 (9th Cir.1984)). However, in response to a request for exculpatory evidence, the prosecution does not have a constitutional duty

---

**9.** We limit our discussion to the facts before us. We express no comment whether a phone call made with the intent to intimidate a witness amounts to government misconduct which requires reversal of a conviction.

**10.** In light of our determination that the district court did not clearly err in rejecting appellants' witness intimidation claim, we need not reach appellants' argument that the alleged intimidation of Losey appears to be a violation of 18 U.S.C. § 1503.

to disclose every bit of information that might affect the jury's decision; it need only disclose information favorable to the defense that meets the appropriate standard of materiality. *United States v. Gardner*, 611 F.2d at 774–75.

■ Rodriguez told IRS agents that Bedford's Central American real estate holdings were nonexistent except on paper. Rodriguez stated that he prepared the fraudulent paperwork and forwarded it to Indec. Although this information was not used at trial, it was included in the government's sentencing report. These statements are clearly not exculpatory.

After trial and sentencing, counsel for Grutchfield interviewed Rodriguez in Costa Rica. In declarations dated April 28, 1983, Rodriguez states that IRS agents chained him to a chair, coached him as to his answers, and compelled him to give the answers they wanted to hear. He further stated that Grutchfield had no knowledge about the true status of Bedford and its assets and that on several occasions he told the IRS agents of Grutchfield's ignorance on this point.

Based on these latter declarations of Rodriguez, appellants assert that there was a *Brady* violation. The April 28 declarations of Arnoldo Rodriguez are not properly before us. Considering the record that is *properly* before us, we find no *Brady* violation or fraud upon the court in this case.

### 5. *Remaining Allegations of Government Misconduct*

Appellants also point to other instances of alleged government misconduct.

We have already discussed the search and seizure of Indec's office. The remedy for any fourth amendment violation is suppression of the tainted evidence. However, other than Chernik's and Yost's post arrest statements, no evidence obtained subsequent to the arrests was introduced at trial.

■ Appellants also claim that the government improperly threatened a prospective witness in order to have him testify at their trial. Appellants assert that the threat "appears" to be a violation of 18 U.S.C. § 872. Appellants clearly lack standing to assert the witness's rights.

■ Relying on *United States v. Stahl*, 616 F.2d 30 (2d Cir.1980), appellants argue that the prosecutor's references to money and greed as appellants' motivation for the conspiracy amounted to prejudicial error. The present case is readily distinguishable from *Stahl*. In *Stahl*, the prosecutor's trial strategy "included a[n] ... appeal to class prejudice." *Id.* at 33. The prosecutor, therefore, engaged in "calculated and persistent efforts" throughout the trial to arouse prejudice against the defendant because of his wealth. *Id.* at 32. The Second Circuit reversed the conviction because it concluded that this conduct by the prosecutor amounted to prejudicial error. In the present case, the prosecutor made two references to money and greed as appellants' motivation—one during the opening statement and the other during closing argument. These two isolated references do not constitute misconduct and they clearly do not amount to prejudicial error.

■ Appellants claim that the district court committed reversible error by allowing the case agent to be in the courtroom throughout the trial. They assert that the case agent abused his position by relaying information and coaching prospective government witnesses. Appellants have cited nothing in the record to substantiate this allegation. Moreover, we find that the district court did not abuse its discretion in allowing the case agent to remain at the prosecutor's table. *See, e.g., United States v. Alvarado*, 647 F.2d 537, 540 (5th Cir. 1981). The case agent was exempt from sequestration. *See* Fed.R.Evid. 615(2) and (3); *United States v. Perry*, 643 F.2d 38, 53 (2d Cir.), *cert. denied sub nom.*, 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981); *United States v. Alvarado*, 647 F.2d at 540.

Finally, appellants claim that the IRS agents manipulated the taped conversations and were poor witnesses. The trial court judge and jury are in the best posi-

tion to judge the accuracy of the taped conversations and the credibility of the witnesses. We find no merit in these claims.

## IV. Challenges to 18 U.S.C. § 371

Appellants raise several challenges to the conspiracy statute under which they were indicted and convicted. We reject each challenge.

### A. Use of 18 U.S.C. § 371 to Indict for Violation of Tax Law

Appellants contend that 18 U.S.C. § 371 was preempted by Congress' enactment of the comprehensive penal provisions of the Internal Revenue Code. Thus, appellants assert that 18 U.S.C. § 371 was not intended to cover conspiracies to defraud the IRS. Relying on this premise, appellants argue that the indictment under this statute was improper and should have been dismissed.

A similar argument was made by the defendant in United States v. Shermetaro, 625 F.2d 104, 109–11 (6th Cir.1980). The Sixth Circuit rejected the argument stating "there is no merit in the contention of appellant that Congress has preempted the field of federal income tax law in Title 26 so as to prevent prosecutions for conspiracy to violate those laws pursuant to 18 U.S.C. § 371." Id. at 111. The Sixth Circuit expressly concluded that conspiracies to defraud the IRS are indictable offenses under 18 U.S.C. § 371. We agree with the Sixth Circuit. Appellants' indictment under 18 U.S.C. § 371 was proper.

### B. Constitutionality of "Conspiracy to Defraud" Prong of 18 U.S.C. § 371

Appellants also urge us to declare unconstitutionally vague the "conspiracy to defraud the United States" prong of 18 U.S.C. § 371. In support of their contention that the "conspiracy to defraud the United States" prong of § 371 is unconstitutionally vague, appellants rely exclusively on a case decided by the West Virginia Supreme Court, State ex rel. Whitman v. Fox, 160 W.Va. 633, 236 S.E.2d 565 (1977).

Appellants' reliance on Whitman is misplaced.

In Whitman, the West Virginia Supreme Court ruled on the constitutionality of its state conspiracy statute, W.Va.Code, 61–10–31 (1978), which was modeled on the federal conspiracy statute, 18 U.S.C. § 371. The court evaluated the state conspiracy statute under the due process clause of the state constitution and found that the section making it unlawful "to defraud the State, the state or any ... county or municipality of the State ..." was unconstitutionally vague. The court held that this prong of the state conspiracy statute "does not adequately inform the citizenry of the activity which may be considered criminal under the statute." Id. 236 S.E.2d at 569. In so holding, the state court commented that the federal conspiracy statute had "miraculously withstood constitutional scrutiny." Id. However, the state court emphasized that it did not "disparage the Federal Courts' wisdom in permitting the word 'defraud' in 18 U.S.C. § 371 [1948] to take an expanded meaning with successive imaginative prosecutions." Id.

We are convinced that the conspiracy to defraud prong of 18 U.S.C. § 371, as applied in this case, is not unconstitutionally vague.

In United States v. Mazurie, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975), the Supreme Court stated "[i]t is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." Id. at 550, 95 S.Ct. at 714. Accord United States v. Bohonus, 628 F.2d 1167, 1173–74 (9th Cir.), cert. denied, 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980); United States v. Broncheau, 597 F.2d 1260, 1263 (9th Cir.), cert. denied, 444 U.S. 859, 100 S.Ct. 123, 62 L.Ed.2d 80 (1979). In examining a statute for constitutional vagueness, we consider whether a person of average intelligence would reasonably understand that his or her conduct is proscribed. United States v. Bohonus, 628 F.2d at

1174; *United States v. Broncheau*, 597 F.2d at 1263. Moreover, "[a] vagueness challenge will not be upheld if judicial explication of a statute provides sufficient clarity to afford fair notice." *United States v. Bohonus*, 628 F.2d at 1174.

In *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), the Supreme Court emphasized that the conspiracy to defraud prong of 18 U.S.C. § 371 reaches *any* conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any government agency. *Id.* at 861, 86 S.Ct. at 1844. Thus, 18 U.S.C. § 371 clearly applies to conspiracies to impede, impair, obstruct, or defeat the lawful function of the Department of Treasury in the collection of income taxes. *See, e.g., United States v. Turkish*, 623 F.2d 769, 771 (2d Cir.1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981). Appellants had fair notice that their conduct would fall within the proscriptions of 18 U.S.C. § 371.

Furthermore, we note that 18 U.S.C. § 371 is, by definition, a specific intent crime. The *mens rea* requirement of § 371 eliminates any objection that the statute punishes the accused for an offense of which he or she was unaware. *See, e.g., United States v. Bohonus*, 628 F.2d at 1174.

Taking each of these considerations into account, we reject appellants' vagueness challenge to § 371. Appellants had sufficient notice that conspiracy to obstruct the collection of taxes was punishable under 18 U.S.C. § 371 and that their conduct might well fall within the ambit of this section.

### C. *Embryonic Conspiracy*

 Relying on *United States v. Wieschenberg*, 604 F.2d 326 (5th Cir.1979), and *United States v. Tarnopol*, 561 F.2d 466 (3rd Cir.1977), appellants contend that the conversations between themselves and the IRS agents were too "embryonic" in nature to support a conviction for conspiracy to defraud the IRS. Essentially, appellants

argue that the evidence was legally insufficient to go to the jury. We reject this claim as did the district court.[11] The government's evidence was sufficient to support a finding that appellants conspired to defraud the IRS and acted in furtherance of that objective.

The present case is readily distinguishable from *Wieschenberg*, and *Tarnopol*. In *Wieschenberg*, the Fifth Circuit properly reversed the convictions because the government's proof of an illegal objective and an overt act in furtherance of an illegal objective was fatally deficient. The defendants merely engaged in discussions to export items to Russia, which, with the proper authorization, could be freely sold to eastern bloc countries. The evidence presented did not support the conclusion that the defendants had agreed to export the items without the proper license and that any act in furtherance of such an agreement had been committed. In those circumstances, the Fifth Circuit properly declined to hold that "mere association of two or more persons to accomplish legal and possibly illegal goals, accompanied by discussions to promote those goals, but with no discernible direction toward either the legal or the legal objectives amount[ed] to criminal conduct under 18 U.S.C. § 371." *Id.* 604 F.2d at 336.

In *Tarnopol*, the Third Circuit reversed the defendants conviction for conspiracy to defraud the United States under 18 U.S.C. § 371. The Third Circuit correctly held that defendants' failure to record certain sales on a sales journal and accounts receivable ledger did not establish an agreement to impede or obstruct the lawful function of the IRS. 561 F.2d at 474–75.

In the present case, the evidence amply supported the inference of an agreement to defraud the IRS and demonstrated acts in furtherance of that objective. The various meetings between appellants and the undercover agents indicated that appellants conspired to defraud the United States by

---

11. At the close of the prosecution's case, appellants moved to dismiss the indictment under Fed.R.Crim.P. 29. The district court denied the motion.

agreeing to promote and effect the sale of Bedford partnership interests to Paoli through a scheme that would enable Paoli to deduct 1980 Bedford losses to which Paoli was not entitled. In furtherance of their plan, appellants: (1) held meetings with Paoli; (2) provided him with detailed advice as to how he could, in 1981, purchase from them an interest in the Bedford partnership and deduct the 1980 Bedford losses on his 1980 personal tax return; and (3) provided Paoli with backdated and fraudulent documentation which he was to present to the IRS in the event of an audit. The documentation indicated that Paoli entered the Bedford partnership in May of 1980, when in fact Paoli actually became a partner in 1981.

### D. *Sentencing Under 18 U.S.C. § 371*

■■■ We reject as frivolous appellants' contention that they were improperly sentenced under the provisions of 18 U.S.C. § 371. Appellants argue that the felony sentence was improper because the object of the conspiracy was not the commission of the felony. The exception in § 371 which provides that the punishment for conspiracy shall not exceed the maximum punishment for the underlying offense applies only to conspiracies to commit substantive offenses, and not to conspiracies to defraud the United States.

### V. *Miscellaneous Issues*

Appellants jointly present several other claims which they contend require reversal of their convictions. We consider these remaining contentions below.

### A. *Scope of Discovery and Cross-Examination*

Appellants argue that the district court committed reversible error by limiting the scope of discovery and cross-examination. Appellants claim that the evidence sought to be divulged through the discovery orders and cross-examination would have supported their claims of government misconduct in this case.

■■■ We review the district court's ruling on the discovery request and scope of cross-examination under the abuse of discretion standard. Our review is limited to the record made at trial.

#### 1. *Discovery Request Under Fed.R.Crim.P. 16(a)(1)(C)*

■■■ Pursuant to Fed.R.Crim.P. 16(a)(1)(C), appellants moved the district court for discovery of internal government documents prepared by government agents in connection with the investigation and prosecution of appellants.[12] Fed.R.Crim.P. 16(a)(1)(C) provides that the defendant is

**12.** Appellants' Rule 16(a)(1)(C) motion provided in relevant part:

Defendant hereby requests the disclosure of the existence and substance of the following material or information that is within the possession, custody or control of the plaintiff, or the existence of which is known or which by the exercise of due diligence could become known to plaintiff, and to permit defendant to inspect and copy or photograph any documents containing such material or information:

A. Notes, reports, memoranda, or other documents authored by employees or agents of the plaintiff Government, including but not limited to the Internal Revenue Service (IRS) and the United States Department of Justice, relating in any way whatsoever to the decision to initiate the investigation or the grand jury sdaproceeding [sic] of the defendant, including but not limited to any report, letter or memorandum authored by The Commissioner, of the Internal Revenue Service, or to any

individual who the Commissioner delegated authority in this matter; [lists names] and any other individual connected with the investigation employed by plaintiff's IRS Criminal Investigation Division; [lists names] and any other individual employed by plaintiff's IRS in any capacity connected in any manner with the subject matter of this criminal action.

B. All documents and records which indicate the names of persons within the IRS who participated in any phase of the information-gathering process leading to the recommendation of the institution of any grand jury or other criminal proceedings against defendant;

C. All documents or records which purport to authorize the participation of any IRS or non-IRS personnel in any form of grand jury or non-grand jury investigation of defendant;

D. The written transcript of the grand jury proceeding which resulted in an indictment against the defendant.

entitled to discovery of materials in the possession, custody, or control of the government which are material to the preparation of the defense. To secure a discovery order under Fed.R.Crim.P. 16(a)(1)(C), a defendant must first make a prima facie showing of materiality. *United States v. Cadet,* 727 F.2d at 1468. Materiality is not established by a general description of the documents sought or by a conclusory argument that the requested information was material to the defense. *Id.* Upon careful review of appellants' request for internal government documents in this case, we find that appellants' request was inadequate to meet the requirements of Rule 16(a)(1)(C).

Appellants' discovery request failed to present any facts which would tend to show that the government was in possession of information that would be material to the defense. Appellants' bald assertions of suspected CIA involvement in this case were insufficient to make a prima facie case of materiality to entitle appellants to the requested documents.[13]

### 2. *Limitations on Cross-Examination*

■ Appellants also take issue with some of the district court's rulings on the scope of the cross-examinations. All but one of the rulings specifically objected to by appellants occurred during the pre-trial suppression hearing. The district court curtailed the cross-examination when defense counsel attempted to probe into the government's legal strategy for the search of Indec's office. The government objected to the questions because they required the agent to divulge material within the attorney-client privilege or because the questions were attempts to discover the contents of internal government documents which could not be obtained through discovery.

The district court did not abuse its discretion in sustaining the objections and in denying appellants' motion to strike the witness's testimony. The cross-examination related to collateral matters which had no bearing on the truth of the witness's direct testimony. *See, e.g., United States v. Seifert,* 648 F.2d 557, 561–62 (9th Cir. 1980). Moreover, none of the evidence seized in the search was used at trial. Thus, any error resulting from the district court's refusal to strike the witness's testimony was harmless.

■ The only instance of district court intervention in cross-examination at trial was with regard to appellants' request for production of the case agent's notes which he took during the trial. The district court determined that the agent was not required to give appellants his notes because he had not referred to them in order to testify. The district court is in the best position to determine the veracity of a witness's statements. We will not second guess the district court's determination regarding the agent's credibility. Accordingly, we find no abuse of discretion in the district court's denial of appellants' motion for production of the case agent's notes.

### B. *Challenge to Expert Witness*

Appellants contend that William T. Hutton was not qualified to testify as an expert because Hutton is an income tax, not a partnership tax specialist. They argue that Hutton's testimony was highly prejudicial and therefore reversal is required.

■ The determination whether an expert witness has sufficient qualifications to testify is a matter within the district court's discretion. *United States v. Trice,* 476 F.2d 89, 91 (9th Cir.), *cert. denied,* 414 U.S. 843, 94 S.Ct. 103, 38 L.Ed.2d 81 (1973). In this case, the district court did not abuse its discretion by allowing Hutton to testify as an expert witness.

Hutton is an attorney, professor, and author in the area of income tax. Hutton testified that he had taught partnership taxation. Appellants' argument that Hutton lacked "specific experience" in partnership taxation goes to the weight of his testimony, not to its admissibility. *See Bit-*

---

**13.** We have already discussed and rejected appellants' contention of government misconduct based on alleged CIA involvement in the investigation and prosecution of this case.

*ton v. International Transport, Inc.*, 437 F.2d 817, 822 (9th Cir.1970).

### C. *Severance*

Chernik and Grutchfield argue that the district court committed reversible error in denying their motions for severance. We reject their claims.

The law is well settled that a motion for severance is addressed to the trial court's discretion. *United States v. Seifert*, 648 F.2d at 563. Before this court will reverse a conviction because of a district court's refusal to grant severance, "the defendant must show that failure to sever was so manifestly prejudicial that it outweighed the dominant judicial concern with judicial economy and compelled the exercise of the trial court's discretion to sever." *Id.* The defendant must show a violation of one of his or her substantive rights in order to make a showing of such manifest prejudice. *Id.*

Where, as here, the reason for severance is the asserted need of a codefendant's testimony, the moving defendant, must show that he or she would call the codefendant at a severed trial, that the codefendant would in fact testify, and that the testimony would be favorable to the moving defendant. *Id.* In addition, the district court must consider the possible weight and credibility of the testimony and the economy of severance at the point the motion was made. *Id.* at 564.

Applying these considerations to the case before us, we are convinced that the district court did not abuse its discretion in denying Chernik's and Grutchfield's motions for severance. First, neither Chernik nor Grutchfield was prevented from presenting an individual defense. Chernik was able to present his defense theory that he reasonably believed that the retroactive allocation of the Bedford partnership interest to Paoli was legal. Chernik's defense was bolstered by Losey's testimony. Chernik also presented his defense theory that he did not participate in the negotiations and agreement with Paoli. Likewise,

Grutchfield was able to present his defense theory. Grutchfield presented his "reliance on counsel" theory which was also bolstered by Losey's testimony. Grutchfield also was able to submit his innocent bystander defense theory to the jury.

Second, the denial of the motion for severance did not create a prejudicial "spillover" of evidence. Except for Chernik's and Yost's post-arrest statements which were admitted with careful limiting instructions, all of the government's evidence was admissible against all of the appellants. *See Hernandez v. United States*, 300 F.2d 114, 122 (9th Cir.1962). Indeed, the district court found that the tapes were "absolutely devastating" against appellants and Yost. Thus, even if severance had been granted, the tapes would have been introduced at each trial.

Next, Chernik and Grutchfield are wrong insofar as they claim that the district court was required to grant their severance motions because their codefendants averred that they would present evidence favorable to Chernik and Grutchfield if severance were granted. These offers to testify at the severed trial were conditional. Little, Chernik, and Grutchfield stated that they would testify at severed trials only when their own proceedings, including any appeals, were complete. Thus, it was unclear whether the codefendants would have testified if severance were granted. Furthermore, given the condition imposed by appellants, the scheduling of the severed trials would be impossible. The district court properly refused to allow Chernik and Grutchfield to "play games" with the scheduling of the trials. *See e.g., United States v. Gay*, 567 F.2d 916, 918–20 (9th Cir.), *cert. denied*, 435 U.S. 999, 98 S.Ct. 1655, 56 L.Ed.2d 90 (1978). The codefendants' conditional offer to testify provided adequate grounds for the district court to exercise its discretion against severance in this case. *See id.*

Finally, the weight and reliance of the codefendants' proferred testimony was questionable. With regard to Chernik, Little and Grutchfield stated that they would

testify that Chernik did not specifically negotiate the Bedford transaction with Paoli and did not draft the documents used in the transaction or know the details of their contents. With regard to Grutchfield, the essence of Little's and Chernik's proffered testimony was that Grutchfield was not part of the negotiations with Paoli which occurred prior to September 21, and only attended the September 21 meeting at Little's request.

The extent of Chernik's and Grutchfield's participation in the conspiracy was evident from the tapes. The codefendants' proffered testimony, while arguably superficially "favorable," would have added little if anything to Chernik's and Grutchfield's defense. Thus, balancing the introduction of the codefendants' proffered testimony against the need for judicial economy, here the balance clearly tipped in favor of a joint trial.

In sum, in evaluating each of the above considerations, we must conclude that the district court acted well-within its discretion in denying the motions for severance.

## VI. Issues Relating to Individual Appellants

### A. Variance Between Indictment and Proof

Grutchfield contends that there was a fatal variance between the indictment and the government's evidence because the indictment charged one conspiracy and the evidence showed two conspiracies. Specifically, Grutchfield asserts that there were three variances between the indictment and the proof: (1) the indictment alleged that the conspiracy commenced on or about December 24, 1980, whereas the proof showed that there was no discussion relating to a backdated partnership investment until December 29, when Yost met with White; (2) the indictment alleged that the purpose of the conspiracy was to sell a partnership interest to Paoli, and the proof showed that Paoli never became involved in the negotiations until February 6; (3) the indictment alleged one continuing conspiracy whereas the proof showed two conspiracies, one be-

ginning in December of 1980 and a second one beginning in August of 1981.

Grutchfield's first two alleged variances are without merit. The proof showed that White first contacted Indec on December 24, 1980. He was referred to Yost. Yost indicated that Indec could assist White's wealthy client secure a tax shelter and that Indec could arrange a 1980 tax writeoff even if the client's check was not received until January of 1981. The client was Paoli. At the December 29 meeting between White and Yost, Yost indicated that a backdated promissory note could be used to document the client's participation in Bedford as of June 1, 1980. Yost gave White a subscription agreement and a promissory note for White and his client to examine.

■ Grutchfield's attempt to build a variance argument on the basis that the backdated documents were not discussed until December 29 and that Paoli did not appear on the scene in person is meritless. The fact that Yost did not expressly discuss use of the backdated material until the first in-person meeting on December 29, or that the actual identity of White's wealthy client was not known by appellants until February 6 are not variances between the proof and the indictment.

Moreover, even if these two items did create a variance, either of these two variances would not affect Grutchfield's, or the other appellants' substantial rights. "A variance between indictment and proof does not require reversal unless it affects the substantial rights of the parties." *United States v. Von Stoll,* 726 F.2d 584, 587 (9th Cir.1984) (citations omitted).

We are also not persuaded by Grutchfield's argument that the indictment alleged a single conspiracy but that the evidence established two conspiracies. Grutchfield's argument is based principally on the six-month hiatus in the undercover investigation.

"The standard of review for sufficiency of the evidence of a single conspiracy is whether any rational trier of fact could have found a single conspiracy on the evi-

dence presented. The standard for determining the existence of a single conspiracy is whether there was 'one overall agreement' among the parties to carry out the objectives of the conspiracy." *United States v. Bloch*, 696 F.2d 1213, 1215 (9th Cir.1982) (citations omitted).

We conclude that a rational trier of fact could have found a single conspiracy to defraud the IRS on the evidence presented in this case. The conspiracy involved the same general scheme, the same key actors, the same methods of accomplishing the transaction, and the same objective. Thus, the conspiracy consisted of one overall agreement between appellants and Yost to promote and sell a partnership interest in Bedford to Paoli for him to use as a tax shelter on his 1980 return and to provide him with false documentation which would "prove" his entry into the partnership as of May 1980, despite his actual entry in 1981.

The six-month hiatus in the IRS investigation did not terminate the "conspiracy" that began in December 1980, and create a new conspiracy in August 1981. "A single overall agreement need not be manifested by continuous activity. There may be a suspension of activities which does not divide a single conspiracy into more than one." *Id.*

A conspiracy is presumed to continue until there is an affirmative evidence of abandonment, withdrawal, disavowal or defeat of the purposes of the conspiracy. *Id.* There was no such affirmative evidence presented in this case. The IRS agents, not appellants, created the six-month hiatus. Indeed, we note that even after agent White informed Yost that he had advised Paoli not to invest, Yost initiated a call to White. The evidence was sufficient to support the finding of a single conspiracy.

Closely related to Grutchfield's claim of the existence of two conspiracies, is his challenge to the district court's failure to give a cautionary instruction regarding the evidence which related to the early stages of the conspiracy as against Grutchfield.

Throughout the trial, Grutchfield's counsel repeatedly objected to the admission of testimony relating to meetings between the undercover agents which occurred prior to September 21, the first time Grutchfield appeared on the scene. At the close of the government's case in chief, the district court expressly ruled all of the evidence admissible against Little, Chernik, and Yost but reserved its ruling as to Grutchfield. The district court never expressly ruled on the admissibility of the evidence as to Grutchfield nor did the district court give the jury a cautionary instruction regarding the evidence relating to the early stages of the conspiracy. While it would have been preferable for the district court to make an express ruling as to Grutchfield, this omission by the district court does not amount to reversible error.

The record demonstrates that there was sufficient evidence other than the coconspirators' statements independently establishing a single conspiracy. *See United States v. Perez*, 658 F.2d 654, 658–59 (9th Cir.1981); *United States v. Eaglin*, 571 F.2d 1069, 1077 (9th Cir.1977), *cert. denied*, 435 U.S. 906, 98 S.Ct. 1453, 55 L.Ed.2d 497 (1978). Once the conspiracy was established, only slight evidence was required to establish Grutchfield's connection with the conspiracy. *See, e.g., id.* Grutchfield's participation at the September 21 meeting more than satisfied the minimal quantum of proof necessary to prove the connection. *See id.* Once the conspiracy and Grutchfield's participation were established, all of the appellants' acts and statements made in furtherance of the conspiracy at any time during the cause of the conspiracy were admissible against Grutchfield. *See, e.g., id.; see also Hernandez v. United States*, 300 F.2d at 122.

The district court did not err by failing to give a cautionary instruction as requested by Grutchfield. The evidence relating to the early stages of the conspiracy was properly admitted against Grutchfield.

### B. *Sufficiency of Evidence*

Appellants Chernik and Grutchfield each challenge the sufficiency of the

evidence supporting their convictions. When reviewing the sufficiency of the evidence to support a conviction, this court must examine the evidence in the light most favorable to the government and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ Our review of the record in this matter convinces us that there was sufficient evidence for a rational jury to find all the essential elements of the conspiracy charge beyond a reasonable doubt as to both Chernik and Grutchfield. The evidence was clearly sufficient to support the jury's finding that Chernik and Grutchfield were knowing and willing coconspirators.

With regard to Chernik, the record demonstrates that he was present at the meetings held on February 6, September 21, and October 7, 1981. At the February 6 meeting, Little introduced Chernik as Indec's tax attorney and theorist. Although Chernik did not say much at the meeting, he was present while Little and Yost gave Paoli a detailed explanation of the Bedford scheme and the mechanics of the proposed sale. Little and Yost pressed Paoli to close the deal so that the following week Chernik could take the backdated subscription agreement and promissory note which they had prepared for Paoli to Bedford's general partner in the Cayman Islands.

At the September 21 meeting, Chernik listened as Little again outlined the mechanics of the proposed Bedford transaction to Paoli. After Little left the meeting, Chernik stayed to provide answers to Paoli's questions regarding the backdated sale of Little's and Grutchfield's interests in Bedford. Chernik attempted to calm Paoli's doubts about the secrecy of his investment and the possibility of problems with the IRS. Chernik, along with Grutchfield, assured Paoli that they would secure the backdated dunning letters to further document that the Bedford transaction had been undertaken in May of 1980. Moreover, Chernik explained to Paoli and Russo

that the backdated promissory note was necessary and sufficient to circumvent the prohibition on retroactive allocations.

With regard to Grutchfield, the record demonstrates that he was present at the meetings held on September 21 and October 7. At the September 24 meeting, Grutchfield was present when Little and Chernik were giving Paoli detailed information on the proposed Bedford transaction. Grutchfield offered Paoli his interest in Bedford. Grutchfield told Paoli that the backdated documents were for display in the event of an audit and emphasized to Paoli that the IRS was not to know about the backdating of the documents. Furthermore, Grutchfield assured Paoli that he could be provided with backdated and fraudulent dunning letters to further document Paoli's participation in Bedford as of May 1980, rather than October 1981, when the Bedford deal was in fact consummated.

The evidence was clearly sufficient to support the jury's finding that Chernik and Grutchfield were knowing and willing conspirators.

## CONCLUSION

In *Dahlstrom,* the defendants advocated a tax avoidance scheme that did not violate any existing statute, regulation or court ruling. Here, appellants in concert promoted, encouraged, and assisted others to evade payment of taxes by means of a fraudulent retroactive allocation of partnership losses, notwithstanding the existence of a statute which bars retroactive allocation of a partner's interest in a partnership. The statute and pertinent regulation gave fair notice that retroactive allocation of partnership losses to a new member was prohibited. By preparing fraudulent partnership records and backdating the promissory note, appellants unequivocally demonstrated their awareness of the requirements of the law and their intent to circumvent it.

Our review of appellants' contentions and of the record below leaves us firmly convinced that no reversible error has been

demonstrated. Accordingly, we affirm the convictions.