UNITED STATES of America, Appellee,

v.

Stanley STAHL, Defendant-Appellant.

No. 262, Docket 79–1218.

United States Court of Appeals,
Second Circuit.

Argued Oct. 2, 1979.

Decided Jan. 22, 1980.

Milton S. Gould, New York City (Saul S. Streit, Ralph L. Ellis, Richard F. Czaja, George O. Guldi, Shea, Gould, Climenko & Casey, New York City, on the brief), for defendant-appellant.

Frederico E. Virella, Jr., Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. and Gregory L. Diskant, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before GURFEIN,* VAN GRAAFEILAND, and KEARSE, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

This is an appeal from a judgment following a jury trial in the United States District Court for the Southern District of New York, in which appellant was convicted of conspiring and aiding and abetting in the bribery of a government employee (26 U.S.C. § 7214(a)(2)). Appellant's principal contention is that prejudicial prosecutorial misconduct deprived him of a fair trial. Because the record amply supports that contention, we reverse the judgment of the district court and remand for a new trial.

* Due to the unfortunate death of Judge MURRAY I. GURFEIN, this case has been decided by the two remaining members of the panel pursuant to § 0.14(b) of the Rules of the United States Court of Appeals for the Second Circuit.

## THE FACTS

In 1970, Max Stahl died and his son, Stanley Stahl, the defendant herein, became the executor of his estate. At the time of his death, Max Stahl owned or had an interest in at least twelve parcels of real estate, and defendant retained Henry Brooks, president of a local appraisal firm, to appraise this property for estate tax purposes. Brooks evaluated the total equity in the properties at $1,275,541 and determined decedent's interest to be $658,455. Abraham Brody, the attorney for the estate, used these figures in preparing the estate tax return, which was filed in April 1972.

At that time, Mario Triolo was the chief supervisor of the IRS Valuation Group, which had the duty of reviewing appraisals submitted for estate tax purposes. The review of the Stahl estate appraisals was performed by Harold Broadman, an IRS appraiser and a subordinate of Triolo. In 1973, Broadman met with attorney Brody and informed him that there was going to be a significant increase in the appraised value of some of the Stahl properties. Brody apparently conveyed this information to the defendant who in turn contacted Brooks about the matter. According to Brooks, who testified for the Government as an unindicted coconspirator, Brooks then had a conversation with Triolo during which Triolo suggested a bribe. Brooks testified that Triolo demanded $7,000 or $8,000 and that Brooks in turn demanded $10,000 from Stahl, planning to keep the excess for himself. Allegedly, the payoff was made by Brooks to Triolo in the early fall of 1973 with money provided by Stahl.

Ultimately, the appraisals on the Stahl properties were raised by approximately $450,000, resulting in the levy of an additional $88,000 in estate taxes. The Government theorized, without presenting any evidence to support its theory, that, but for the bribe, the increase in appraised value would have been larger than it was. However, because neither the Government nor Stahl

called Broadman as a witness, the record is unclear as to whether the increase in appraised value was in fact any less than Broadman had initially proposed.[1]

An investigation into IRS Valuation Group corruption conducted in 1977 and 1978 revealed the complicity of Brooks in several alleged bribes. When confronted with the evidence against him, Brooks entered into a cooperation agreement with the Government in November 1978. Subsequently, Brooks participated in a videotaped conversation with Triolo and two audio-taped conversations with Stahl. Portions of these conversations were introduced into evidence. After a nine-day trial, the jury returned a verdict of guilty.

## PROSECUTORIAL MISCONDUCT

Appellant contends that the prosecutor engaged in a continuous course of conduct designed to equate wealth with wrongdoing and to appeal to the potential bias of not-so-wealthy jurors against a very wealthy real estate entrepreneur. That this was the prosecutor's trial strategy, appellant suggests, is readily apparent from the Government's Memorandum of Law in Response to Defendant's Motion for a New Trial. In that memorandum, the Government sought to defend the tenor of remarks made in summation by stating that it "properly argued to the jury the logical inference that a man whose *total life* is geared to make money in real estate would also, in all likelihood, be driven by greed to pay the $10,000 bribe in order not to pay substantial monies in taxes." (emphasis in original).

Although the district court denied defendant's motion for a new trial, it strongly denounced the Government's argument on this point, commenting that "it impermissibly equates success, affluence and a single minded occupation with one's business affairs with greed and corruption." The court concluded, however, that the Government had not really gone that far in its

---

1. Brody testified that the originally proposed increase in appraised value was in the neighborhood of "half a million dollars." Defendant testified that there was never a reduction in Broadman's originally proposed figures.

argument on summation and that, in any event, the jury had been given curative instructions against drawing adverse inferences from the defendant's wealth or social status.[2]

Our own review of the record and our questioning of the Assistant United States Attorney during oral argument lead us to conclude that this young prosecutor did in fact intend to arouse prejudice against the defendant because of his wealth and engaged in calculated and persistent efforts to arouse such prejudice throughout the trial. In addition, the prosecutor made several statements during the trial that were not supported by the evidence and may, in some instances, have been intentionally misleading.

By way of example, the prosecutor stated in his opening that "this case is also about money, tremendous amounts of money", and then continued:

The proof in this case will not deal with small time bribe-givers. It will deal, however, with the basic roots of corruption both within and without or outside the IRS. . . . [Y]ou are going to hear proof, members of the jury, about the unchecked flow of corruption in various Park Avenue offices, in the IRS, and in the executive offices of a major real estate company in this city. . . . [I]t will deal with the man whose illegal conduct in business made him a major corrupt bribe-giver in the City of New York.

Actually, the Government sought to connect Stahl with one bribe only, and this had nothing to do with the conduct of Stahl's business but instead arose out of the administration of his father's estate.

Time and again during interrogation of witnesses, the prosecuting attorney went out of his way to refer, or have witnesses refer, to the "Park Avenue offices" of the various participants in this drama, an emphasis that had nothing whatever to do with defendant's guilt or innocence. When questioning Attorney Brody, the prosecutor persistently tried to get Brody to characterize the Stahl estate as a "substantial estate" of some "$13.5 million dollars", when in fact the prosecutor had the estate tax forms in front of him and knew that the total estate was approximately one million dollars and the taxable estate, after legitimate deductions, was approximately $300,000.[3] When the defendant took the stand, the prosecutor made a point of delving into his estimated net worth (over $20 million) and how he had managed to build up such a fortune.

Finally, in summation, the prosecutor referred to Stahl as "a multi-millionaire businessman in real estate, who his whole life is geared to buy property, buy property" and whose "office, his suite office, has just dollar signs, dollar signs all over. That's all he cares about." In discussing Stahl's motivation, the prosecutor said, "But because Mr. Stahl is a man whose life is geared to make money in real estate, money, money, money, this is a chance he saw to have the fix in . . . .." In the prosecutor's words:

The decision was, "Do I have a choice here? Is it a choice between profit and money or conscience and responsibility?" And Mr. Stahl chose money and profit. To make money, money. The man who built up a $12,000 investment into the millions of dollars which he doesn't even know how much he owns, or how many apartment buildings he has. It is his greed.

These examples indicate the nature of the prosecutor's trial strategy—a strategy that

---

**2.** The district judge stated that "[t]he remarks of the Government prosecutor stretch at times to the outer limits of propriety . . . .." We believe they exceeded those limits.

**3.** The $13.5 million figure represented the gross value of the real property without taking into account over $12.2 million in encumbrances. The prosecuting attorney first used this figure in a question addressed to Brody. After de-

fense objection, the prosecutor's comment was stricken, and the jury was instructed to disregard it. The court then sustained no less than four defense objections to questions seeking to elicit the $13.5 million figure from Brody. The prosecutor finally abandoned the attempt. In summation, however, the prosecutor again referred to the estate as a "$13.5 million dollar estate," a statement he knew was inaccurate.

obviously included a persistent appeal to class prejudice. Because such appeals are improper and have no place in a court room, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239–40, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *New York Central R. Co. v. Johnson*, 279 U.S. 310, 319, 49 S.Ct. 300, 73 L.Ed. 706 (1929); *Koufakis v. Carvel*, 425 F.2d 892, 900–905 (2d Cir. 1970); *Benham v. United States*, 215 F.2d 472, 473–75 (5th Cir. 1954); *Drasner v. Thomson McKinnon Securities, Inc.*, 433 F.Supp. 485, 489–91 (S.D.N.Y.1977), we are compelled to reverse. This was not a case in which the proof of guilt was so overwhelming that censure of misconduct will suffice. Nor is it one in which curative instructions by the trial court were sufficient to eliminate the taint. See *United States v. Berger*, 295 U.S. 78, 85, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). There was prejudicial error, and the judgment of conviction must be reversed.

## OTHER CLAIMS OF ERROR

■ Harold Broadman, the IRS appraiser who was an alleged but unindicted coconspirator, was present in court throughout the trial. However, neither party called him as a witness. The district court correctly refused defendant's request to charge that the jury might infer that the Government's failure to call Broadman was due to the fact that his testimony would have been unfavorable to the prosecution. If the district court had been requested to do so, it might have charged that under the circumstances an adverse inference could be drawn against either side. *United States v. Erb*, 543 F.2d 438, 444–45 (2d Cir.), *cert. denied*, 429 U.S. 981, 97 S.Ct. 493, 50 L.Ed.2d 590 (1976).

■ We are more troubled by appellant's complaints concerning the Government's video-tape of a conversation between Brooks and Triolo. This conversation, which took place on December 8, 1978, when Brooks was cooperating with the Government, was offered in evidence for the purpose of establishing the following exchange:

Brooks: You know, you know what I keep laughing it stands out in my mind that time when that shmucky Broadman went to that Stanley Stahl and he asked him for the dough, you remember? Triolo: Yeah.

Because Triolo was not present during any conversations between Broadman and the defendant, any testimony by Triolo concerning such conversations would have been objectionable as hearsay. *United States v. Check*, 582 F.2d 668 (2d Cir. 1978). We have carefully examined the folio references relied upon by the Government to support the video-tape's admissibility as impeaching evidence and find testimony by Triolo that there was "friction" between Broadman and Brooks and a denial of knowledge by Triolo as to whether Broadman had gone to Stahl concerning it. This was not a very strong foundation for admitting the purported substance of a conversation between Broadman and Stahl, as framed by a witness cooperating with the Government at a carefully staged interview some five years after the event at issue. . Brooks, the cooperating witness, testified at trial that the defendant admitted having been approached by Broadman; the defendant denied that he had talked to Broadman. The question of which of these two men was telling the truth was a very important issue in the case. Despite the trial court's limiting instructions concerning the Brooks-framed video-taped statement, we are not at all sure that the probative value of this proof, with all the irrelevant matter that accompanied it, was not substantially outweighed by its potential prejudice to the defendant. See Fed.R.Evid. 403; *United States v. Shoupe*, 548 F.2d 636, 643–44 (6th Cir. 1977); *United States v. Brown*, 160 U.S.App.D.C. 190, 490 F.2d 758 (D.C. Cir. 1974).

However, the trial court has considerable discretion in determining whether evidence is properly admitted for impeachment purposes. See *United States v. Rogers*, 549 F.2d 490, 496 (8th Cir. 1976), *cert. denied*, 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977); *United States v. Dye*, 508 F.2d 1226, 1234 (6th Cir. 1974), *cert. denied*, 420 U.S.

974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975). We are not prepared to say that there was an abuse of the district court's discretion in the instant case. We are confident that, upon retrial, the able district judge will again give the matter careful consideration, bearing in mind our misgivings as expressed herein.

Appellant's other contentions are without substance and require no comment.

Reversed and remanded for a new trial.