UNITED STATES of America, Appellee,

v.

Steven B. WEISS, Barry Gleicher, Patient Medical Systems Corp., a/k/a "Integrated Generics, Inc.," and Health–Med, Inc., Defendants,

and

Patient Medical Systems Corp., a/k/a "Integrated Generics, Inc.," Barry Gleicher, Defendants–Appellants.

Nos. 781, 782, Docket 89–1434, 89–1444.

United States Court of Appeals, Second Circuit.

Argued April 11, 1990.

Decided Sept. 19, 1990.

Michael J. Horowitz, Washington, D.C. (Jonathan R. Moore, Windels, Marx, Davies & Ives), for defendant-appellant Barry Gleicher.

Martin B. Adelman, P.C., New York City, for defendant-appellant Patient Medical Systems Corp., a/k/a "Integrated Generics, Inc."

Jon M. Bevilacqua, Sp. Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., and Kevan Cleary, Asst. U.S. Atty., Brooklyn, N.Y.), for appellee.

Before LUMBARD, WALKER, and FRIEDMAN,* Circuit Judges.

FRIEDMAN, Circuit Judge:

In this appeal the appellants Gleicher and Patient Medical Systems Corp., a/k/a "Integrated Generics, Inc." ("Patient Medical"), challenge on various grounds their criminal convictions after a jury trial in the United States District Court for the Eastern District of New York of mail fraud, mail fraud conspiracy, and making false

* Daniel M. Friedman, of the United States Court of Appeals for the Federal Circuit, sitting by

representations of material facts on Medicare and Medicaid claims. The third convicted defendant, Weiss, had not been sentenced at the time this appeal was argued, and therefore did not join in the appeal.

The indictment, filed in July 1988, charged the three defendants named above and Health–Med, Inc. ("Health–Med"), a predecessor corporation of Patient Medical, with a conspiracy from February 1983 to December 1986, to defraud and to obtain money from the Health and Human Services Administration by means of false and fraudulent pretenses and representations. The indictment alleged that "[t]he object of the conspiracy was" "to obtain federal funds by and through the fraudulent submission of Medicare Claim Forms to Ohio, Illinois and New Jersey Medicare carriers for services with a 'point of sale' in New York, in order to receive the higher rate of Medicare reimbursement paid by these out-of-state carriers," and that pursuant to the conspiracy the defendants "submitted[ ] Medicare Claim Forms to the Ohio, Illinois, and New Jersey Medicare carriers, knowing that these Medicare Claim Forms should have been submitted to New York Medicare carriers."

Following the jury convictions, the district court sentenced Gleicher to three years' imprisonment, followed by five years' probation, and fines and a court assessment totaling $126,900. The court sentenced Patient Medical to fines, prosecution costs, and court assessments totaling $173,650.

I

A. *The Statutory and Regulatory Scheme for the Payment of Medicare Claims.*

Under Part B of Medicare, providers of "medical and other health services," which include providers of "durable medical equipment ... used in the patient's home ... whether furnished on a rental basis or purchased," 42 U.S.C. § 1395x(s)(6), are en-

designation.

titled to reimbursement for the reasonable cost of providing such services. 42 U.S.C. § 1395k(a)(2)(B). One example of such "durable medical equipment," for which reimbursement is available, is the "rental or purchase of a medically necessary seat lift when prescribed by a physician for a patient...." *Medicare Carriers Manual,* § 60–8.

Within the Department of Health and Human Services (the "Department") the Health Care Financing Administration (the "Administration") is responsible for the administration of Part B of Medicare. Reorganization Order effective March 8, 1977. The Administration has promulgated the Medicare Carriers Manual (the "Manual"), which is the official explanation of the Medicare statute and the regulations.

Pursuant to statutory authority, 42 U.S.C. § 1395u(a), the Secretary has entered into contracts with entities throughout the country to process and pay Medicare claims. There are 47 such entities, known as carriers, each of which is responsible for paying claims in a specified geographic area.

Each individual carrier sets the amount it will pay for a particular service. As a result, the amounts the different carriers will pay for the same service may vary from carrier to carrier. The Manual explains the basis upon which a provider of services is to determine to which carrier it should submit a claim:

> Jurisdiction of payment requests for services of a supplier ... with branch offices or sales/rental outlets in more than one carrier's jurisdiction lies with the carrier for the location where the service is furnished to the beneficiary whether or not the supplier uses a central billing office. (This means the site where the company met with the beneficiary or received the beneficiary's call.) All claims for the services of suppliers from branch officers or sales/rental outlets outside the carrier's service area must be transferred to the appropriate carrier for processing.

*Manual,* § 3102.B, at 3–63.2—3–64.1. The Manual provides "EXAMPLES OF MUL-TI–CARRIER JURISDICTION," which explain in detail how this rule works. *Id.* at 3–64.1—3–64.3.

The "location where the service is furnished to the beneficiary," *i.e.,* the "site where the company met with the beneficiary or received the beneficiary's call," and which determines the carrier to which the claim should be submitted, is known in the Medicare field as the "point of sale."

In addition to being published in the Manual, the rules governing the carrier to which a claim should be submitted are also from time to time published by the carriers themselves, in publications they send to providers. *See, e.g., Medicare Newsletter for Durable Medical Equipment Suppliers,* at 8 (Nationwide Mut. Ins. Co., Ohio July 1981).

One of the carriers to whom Patient Medical submitted Medicare claims was Nationwide Insurance Company, the Medicare carrier for Ohio ("Ohio Nationwide"). In the regular course of business, Ohio Nationwide distributes bulletins to all durable medical equipment providers that are registered with it, including Patient Medical. One bulletin, dated July 1981, explained:

> Processing jurisdiction for services of a supplier with branch offices or sales/rental outlets in more than one carrier's jurisdiction lies with the carrier for the location where the service is furnished to the beneficiary whether or not the supplier uses a central billing office—this means the site where the company met with the beneficiary or received the beneficiary's call. All claims for the services of suppliers from branch offices or sales/rental outlets outside the carrier's service area must be submitted to the appropriate carrier for processing.

*Id.* at 8. "[T]hat particular document [is] sent to all providers that bill [the] carrier" and "from time to time over the years ... similar documents [are sent] to the providers explaining how to bill the carrier." Moreover, Ohio Nationwide "send[s] out current and past newsletters that are pertinent to that particular practice." At the time Health–Med first joined the Medicare program, Ohio Nationwide sent it a similar

bulletin stating that "[t]he revised policy [of the Administration] stipulates that, effective with dates of service of July 1, 1977, jurisdiction is based on the *point of sale*, regardless of where the billing is being done," *Medicare Bulletin* (Nationwide Mut. Ins. Co. undated) (emphasis in original). A similar notice was included in a December 1985 Blue Cross/Blue Shield of Illinois newsletter.

Form 1500 is the official form, prepared by the Administration and approved by the Office of Management and Budget, on which a provider submits a claim for reimbursement to a carrier. Each carrier has its own version of the Medicare form.

Box 31 of the form asks for the "PHYSICIAN'S OR SUPPLIER'S NAME ADDRESS ZIP CODE" and "TELEPHONE NUMBER." The Manual states that the "[n]ame and address information is furnished to help carriers determine whether the physician/supplier of services can qualify for benefit payments, and as an aid in determining jurisdiction and referring the claim to the servicing carrier where appropriate." *Manual*, § 4011.8, at 4–15. The Commerce Clearing House ("CCH") reprints these instructions in one of its publications. *See Medicare and Medicaid Guide* (CCH), ¶ 10,275.08.

## B. *The Facts of This Case.*

Viewing the facts most favorably to the government, which is the standard on appeal from criminal convictions, *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), *U.S. v. Vanwort*, 887 F.2d 375, 385 (2d Cir.1989), there was evidence from which the jury could have found:

At least until 1984, Health–Med was in the business of providing durable medical equipment to individuals whom Part B of Medicare covered. Its corporate headquarters and primary place of business were at 222 Franklin Avenue, Franklin Square, New York. In August 1984, Health–Med ceased operations, but continued to submit bills to Medicare carriers through Patient Medical until January 1986. From 1983 to 1984, the defendant Weiss was the president of Health–Med.

The appellant Patient Medical was in the same business and had the same New York address as Health–Med. The appellant Gleicher, who had not been formally connected with Health–Med, was a vice president, treasurer, and director of Patient Medical. Weiss was a vice president of Patient Medical.

When Health–Med ceased operations in 1984, Patient Medical hired all of its employees and continued to serve all of its customers. In addition, Patient Medical continued to submit bills for equipment Health–Med had provided.

Weiss and Gleicher first met in August 1983. Initially, they had a number of conversations about submitting Medicare bills. They discussed the use of computers for such billing. They continued to discuss Medicare billings from 1983 through 1986.

1. *Health–Med's Initial Submission of Claims to the New York Medicare Carrier and Subsequent Submission to the New Jersey Carrier.*

Initially, Health–Med submitted Medicare claims for the durable equipment it sold to New York residents to Blue Cross and Blue Shield of Greater New York ("N.Y. Blue Cross"), the carrier for the State of New York. In Box 31 of each Form 1500 on which Health–Med filed its claims it gave its address as:

220 FRANKLIN AVENUE
FRANKLIN SQUARE NY 11010

In October 1983, Health–Med began submitting its claims for seatlift chairs sold to New York beneficiaries to Prudential Insurance Company ("N.J. Prudential"), the carrier for the State of New Jersey. Ms. Weisz, a former employee of Health–Med and Patient Medical, was instructed by Weiss to file the claims with N.J. Prudential, instead of N.Y. Blue Cross, "because the reimbursement was higher."

Box 31 of the Form 1500's submitted to N.J. Prudential gave as Health–Med's address:

43 EDWARD HART DRIVE
JERSEY CITY NJ 07303

The "TELEPHONE NO." listed in Box 31 was "800 645-6225." Health–Med's New Jersey stationery used the same address, and a New Jersey telephone number—(201) 355-3900. When Health–Med decided to file these claims in New Jersey, a label with the above New Jersey address was placed over its previously typed New York address, at the direction of Weiss.

Health–Med had a warehouse at 43 Edward Hart Drive in Jersey City, but no sales were made from that address. All mail sent to that address was forwarded to Health–Med's New York office at the Franklin Square address. All calls made to the New Jersey telephone number were call-forwarded to and answered at the Franklin Square location.

Following a random inspection of claims Health–Med had filed, N.J. Prudential, by letter dated June 7, 1984, addressed to Weiss at the New Jersey address, stated that Health–Med had been "submitting Medicare claims for supplies sold or rented to beneficiaries in the State of New Jersey, Illinois and New York." After quoting section 3201.B of the Manual, N.J. Prudential stated that "[i]n the future, we will only process those claims specifying the State of New Jersey as the point of sale" and that "[t]he claims for sales or rentals made in Illinois and New York should be sent to the appropriate Medicare Carrier for each of these States."

Weiss responded that "[o]ur New Jersey office handles sales for the immediate tri-state area," and stated that "as Health Med has grown in outer states, local sales offices have been gradually opened." He also stated that "[i]n New York, Health Med has arrangements with a Service Bureau to handle data processing functions including claims printing."

If N.J. Prudential had known Health–Med had no salespersons based in New Jersey, and that all calls to the New Jersey telephone were call-forwarded to New York, N.J. Prudential would not have paid these claims.

The last check N.J. Prudential issued to Health–Med was dated February 15, 1985.

Gleicher also corresponded with N.J. Prudential about filing claims with it. In a letter dated March 31, 1984, with a New York City return address, Gleicher wrote:

I am interested in becoming a supplier of medical supplies and medical equipment. Could you please mail to me an application to become a provider and the amount of reimbursement for the various approved medical supplies and equipment. In addition, please mail to me pertinent information regarding your services.

N.J. Prudential replied:

Medicare makes payment according to the State in which the services were rendered. Therefore, since you are from New York, you should send any claims you have for New Jersey Medicare patients to your Carrier in New York.

2. *The Submission of Claims to the Ohio Carrier.*

Following N.J. Prudential's refusal to accept Health–Med claims, Patient Medical, Health–Med's successor, began in March 1985 to submit claims to Nationwide Insurance Company ("Ohio Nationwide"), the carrier for the State of Ohio. In Box 31 of the Form 1500's, Patient Medical gave its address as

1614 MIRAMAR COURT
CINCINNATI OH 45237

It also gave a Cincinnati telephone number.

This Ohio address was the residence of Mrs. Lifshitz, a housewife and full-time mother with eight children. When an Ohio Nationwide employee visited the address, no medical supplies, equipment, or commercial signs were visible there. Mrs. Lifshitz worked for Patient Medical and Health–Med and ran an office, but not a sales office, for them. She had made two sales of catheters and related equipment for Health–Med. Mrs. Lifshitz did not process any of the claims Patient Medical submitted to Ohio Nationwide. All of such processing was done in New York at the Franklin Square location.

All telephone calls to the Cincinnati number were call-forwarded to the Franklin

Square office in New York. All mail sent to Mrs. Lifshitz's address was forwarded to the New York address.

In a telephone conversation in June 1985, an Ohio Nationwide employee told Weiss that he needed to establish the point of sale for the claims Patient Medical had submitted to Ohio Nationwide. In response, Weiss "insisted that all of their contacts to Medicare beneficiaries originate from the distribution of their catalogue sent to physicians and nurses throughout the nation. Mr. Weiss stated that there are some phone contacts, but that the phone contacts always originate from his Cincinnati office." Although Weiss initially "stated that [Patient Medical had] absolutely no sales offices or sales representatives outside Ohio or West Virginia ... he corrected his statement by giving the name and address of their Los Angelos [sic] representative...." Weiss stated that Patient Medical "had no sales officials or sales representatives in the state of New York."

Ohio Nationwide discovered "four claims which have been submitted to our office for processing" that should not have been submitted there. In a letter dated July 25, 1985, to Weiss, the manager of claims administration for Ohio Nationwide stated that "[w]e are forwarding the claim matter back to you as we feel the processing lies under a different jurisdiction, in terms of the geographic location in which the items were supplied." Ohio Nationwide explained:

> Effective July 1, 1977, the Health Care Financing Administration revised its' [sic] policy regarding supplies furnished by organizations which have branch offices and/or sales representatives that bill through a centralized billing office. The previous policy stipulated that the Carrier having jurisdiction for the billing office would process all claims even if the particular supplies represented on that claim were provided in an area not within that Carrier's jurisdiction. The revised policy stipulates that, effective with dates of service July 1, 1977, jurisdiction is based on the point of sale, regardless of where the billing is being done.

Ohio Nationwide also indicated that its investigation determined "that the supply was actually sold within the states in which the beneficiaries reside." To aid Patient Medical in correct billing, Ohio Nationwide gave Weiss the name and address for the proper carriers for those claims, *i.e.*, the New York and Florida carriers.

In a further investigation of Patient Medical, Ohio Nationwide ascertained that "the sale of the equipment and supplies are not through Ohio but through New York." In an August 1985 letter to Weiss, Ohio Nationwide informed him that "all claims received by [its] office will be transferred to" N.Y. Blue Cross and "suggest[ed] that [Patient Medical] begin submitting [its] Medicare claims to" the latter.

In response, Patient Medical's comptroller requested that Ohio Nationwide send Patient Medical's claims back to its Cincinnati address and not to New York. Gleicher wrote most of this letter. Ohio Nationwide denied this request.

Ohio Nationwide issued its final check to Patient Medical on August 2, 1985.

3. *The Submission of Claims to the Illinois Carrier.*

After the Medicare claims submitted to Ohio Nationwide had been "kicked out," Gleicher ordered the computer programmer "to hold all Medicare bills that [Patient Medical] had printed for seat lift chairs and other supplies that were to go to the state of Ohio...." Then, "[a]fter the initial waiting period while [Gleicher and Weiss] decided where to send the claims, [Gleicher] came in and told [the computer programmer] the claims would be sent to the State of Illinois."

Patient Medical then began to file claims with Blue Cross/Blue Shield of Illinois ("Illinois Blue Cross"), the carrier for the State of Illinois. In Box 31 of the Form 1500's, Patient Medical gave its address as

480 CENTRAL AVENUE
NORTHFIELD IL 60093

It also gave an Illinois telephone number.

Illinois Blue Cross determined that another Northfield address also given in Box

31 on some of Patient Medical's filings, 540 Frontage Road, was a small office, with two employees, and a virtually empty filing cabinet. Health–Med had given 8600 West Bryn Mawr, North Chicago, Illinois, as its address on the forms it had submitted to Illinois Blue Cross. Upon visiting this office, an Illinois Blue Cross employee was informed by the receptionist that "no one from Health Med ever was there," and that "generally she forwards their mail to an address in New York and if they receive any calls, she takes the message and telephones the messages over to their office in New York."

Illinois Blue Cross then refused to process any more claims of Patient Medical, and transferred all pending claims to New York Blue Cross because they were "submitted for New York beneficiaries residing in New York nursing homes . . . ." In informing Patient Medical of its decision, Illinois Blue Cross explained to Patient Medical the point of sale rule, and its reasons for rejecting these claims.

Illinois Blue Cross issued its final check to Patient Medical in August 1985.

In filing the claims with Illinois Blue Cross, Patient Medical sent large mailing envelopes to its national sales manager in Illinois. These mailing envelopes were addressed to Patient Medical in Illinois and had the Franklin Square address in New York as a return address. Each large mailing envelope contained a number of smaller envelopes addressed to Illinois Blue Cross, which had a return address of 540 Frontage Road, Northfield, Illinois, which contained Patient Medical's claims for reimbursement. These envelopes addressed to Illinois Blue Cross were sent certified mail by a mailing service in Illinois.

### 4. The Decision Where to File the Claims.

Weiss, the only defendant to testify, stated that he was ignorant of the detailed regulations governing the filing of Medicare claims. He indicated that in filing the claims he followed the advice and recommendations of Gayle Uhlenburg, a former vice president of Health–Med.

Mrs. Uhlenburg, however, testified that although she signed the claim forms, she did so at the direction of Weiss. Another former Patient Medical employee, Ms. Estee Weisz, testified that Weiss and Gleicher decided to which Medicare carrier the claims should be submitted. Both the Manual and the CCH Medicare/Medicaid Guide were kept in Weiss' office. Both Weiss and Gleicher periodically looked at those volumes, and Weiss had numerous discussions with other employees at the office concerning the filing of Medicare claims.

### 5. The Financial Benefit to the Appellants.

A government auditor calculated that the appellants received from N.J. Prudential, Ohio Nationwide, and Illinois Blue Cross $198,753.48 more than they would have received had the claims been submitted to and paid by N.Y. Blue Cross.

## II

■ Both appellants contend that the Paperwork Reduction Act of 1980, 44 U.S.C. § 3501–3520 (1982) (the "Act"), bars their prosecution.

The Act states that one of its purposes is "to minimize the Federal paperwork burden for individuals, small businesses, State and local government, and other persons." 44 U.S.C. § 3501(1). As the legislative history indicates, the Act was designed "to reduce and minimize the burden Government paperwork imposes on the public." S.Rep. No. 930, 96th Cong., 2d Sess. 2 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News, 6241, 6242.

The keystone of the Act is the requirement that all federal agencies submit all "information collection requests" to the Director of the Office of Management and Budget for review. *See* 44 U.S.C. § 3507. If the Director approves the information collection request, he must give it a control number. *See* 44 U.S.C. § 3504. "An agency 'shall not conduct or sponsor the collection of information unless' the information collection request has been submitted to and approved by the Director, *see* 44 U.S.C.

§ 3507(a), and 'shall not engage in a collection of information without obtaining from the Director a control number to be displayed upon the information collection request,' *see* 44 U.S.C. § 3507(F)." *United States v. Smith*, 866 F.2d 1092, 1094 (9th Cir.1989).

Section 3512, captioned "Public Protection," states:

Notwithstanding any other provision of law, no person shall be subject to any penalty for failing to maintain or provide information to any agency if the information collection request involved was made after December 31, 1981, and does not display a current control number assigned by the Director, or fails to state that such request is not subject to this chapter.

The Act defines "information collection request" to mean

a written report form, application form, schedule, questionnaire, reporting or recordkeeping requirement, or other similar method calling for the collection of information[.]

Form 1500, the official form for submitting Medicare claims, was approved by the Director and has a control number. At the time of the events in this case, however, the Secretary had not submitted the Manual to the Director for his approval, apparently on the theory that the Act did not cover it, and the Manual therefore did not bear a control number.

The appellants contend that the Manual was an "information collection request" that required the Director's approval before it could be used, that the Manual required that the point of sale be shown on Form 1500, and that section 3512 therefore precluded their conviction for filing false Form 1500's with the New Jersey, Ohio, and Illinois Medicare carriers.

Assuming without deciding that the Manual is an "information collection request"— an issue the parties vigorously dispute— and therefore required the approval of the Director of the Office of Management and Budget, that conclusion would not warrant the reversal of the appellants' convictions.

Section 3512 bars the imposition of "any penalty" upon any person "for failing to … provide information to any agency … if the information collection request involved … does not display a current control number assigned by the Director.…" The gravamen of the crimes for which the appellants were convicted, however, was not "failing to … provide information," but knowingly providing false information. The addresses they gave in Box 31 of their Form 1500's to the New Jersey, Ohio, and Illinois carriers as the "supplier's … address" were not the addresses from which the sale was made, as Box 31 required them to state.

This statement was a deliberate misstatement, designed and intended to convince N.J. Prudential, Ohio Nationwide, and Illinois Blue Cross that they, and not New York Blue Cross, were the carriers that should process and pay the claims. The fact that it was the Manual that explained the proper address to be shown in Box 31, *i.e.*, the point of sale, did not convert the appellants' conviction into one for "failing to … provide information" covered by the Manual.

It was Form 1500, and not the Manual, that required the submission of the point of sale address in Box 31. The appellants' conviction resulted from the jury's determination, which the record fully supports, that the appellants knowingly provided false information in Box 31, in order to defraud the United States by obtaining higher payments for their seat lift chairs than they were entitled to and would have received had they submitted the claims to New York Blue Cross.

The present case stands in sharp contrast to *United States v. Smith*, 866 F.2d 1092 (9th Cir.1989), upon which the appellants rely. In *Smith*, the defendants were convicted of working on mining claims in a national forest without first having filed a Plan of Operations with the Forest Service. A Forest Service regulation required the filing of such a plan; the regulation, however, did not bear a control number because the Director of the Office of Management and Budget had not approved it.

The court of appeals reversed the conviction. It held that

[t]he Plan of Operations filing requirement is an information collection request that lacks a current control number. Consequently, [44 U.S.C. § 3512] by its terms prohibits the imposition of "any penalty" against the appellants, including criminal convictions, for their failure to comply with the Plan of Operations filing requirement.

866 F.2d at 1099 (footnote omitted).

In *Smith*, the crime for which the defendants were prosecuted was failing to file with the Forest Service a Plan of Operations, as the regulation required. Once the court held that the regulation was an "information collection request," which did not bear a control number, it necessarily followed that section 3512 barred the defendant's conviction for "failing to ... provide the information" to the Forest Service, *i.e.*, the Plan of Operations the regulation required. The crime in *Smith* was the failure to make any filing. The Ninth Circuit held that because the filing requirement was imposed by an information collection request (the regulation) that bore no control number, section 3512 barred the conviction.

In the present case, in contrast, the appellants filed what they were required to file—the Form 1500—but made false statements on the form. They were convicted for making those false statements, not for failing to file at all. Section 3512 did not bar their convictions. *See* Funk, *The Paperwork Reduction Act: Paperwork Reduction Meets Administrative Law*, 24 Harv.J. on Legisl. 1, 77 n. 411 (1987) ("The Public Protection provision at most only protects a person from penalties for *failing* to file information. It does not protect one who files information which is false. *Cf.* 18 U.S.C. § 1001 (1982)"). (Emphasis in original.)

The Supreme Court dealt with a somewhat related question in *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). There the defendants had been convicted of conspiring to defraud the United States by filing false non-Com-

munist affidavits with the National Labor Relations Board. The defendants contended that their conviction should be reversed because section 9(h) of the Taft–Hartley Act, which required the filing of non-Communist affidavits before a union could utilize the procedures of the National Labor Relations Board, was unconstitutional. The Court found it unnecessary to reach the question, because the defendants could not "attack the constitutionality of § 9(h)." 384 U.S. at 865, 86 S.Ct. at 1846.

The Court pointed out that the defendants "were indicted for an alleged conspiracy, cynical and fraudulent, to circumvent the statute. Whatever might be the result where the constitutionality of a statute is challenged by those who of necessity violate its provisions and seek relief in the courts is not relevant here. This is not such a case. The indictment here alleges an effort to circumvent the law and not to challenge it...." *Id.* The Court stated: "This is a prosecution directed at petitioners' fraud. It is not an action to enforce the statute claimed to be unconstitutional." *Id.* at 867, 86 S.Ct. at 1847. The Court quoted with approval its statement in *Kay v. United States*, 303 U.S. 1, 6, 58 S.Ct. 468, 471, 82 L.Ed. 607 (1938), where, in upholding a conviction for making false statements in connection with the Homeowners' Loan Act of 1933, without deciding whether the act was constitutional, the Court said: "When one undertakes to cheat the Government or to mislead its officers, or those acting under its authority, by false statements, he has no standing to assert that the operations of the Government in which the effort to cheat or mislead is made are without constitutional sanction." *Id.* 384 U.S. at 866, 86 S.Ct. at 1847.

The reasoning of these cases is no less applicable to the present case. If, as those cases held, it is no defense to a charge of filing false statements that the statute requiring the filing is unconstitutional, *a fortiori*, it is no defense to a charge of filing false statements that the government document that prescribed the details of filing had not been approved by the Director of the Office of Management and Budget, as

the Paperwork Reduction Act allegedly required.

The appellants argue, however, that the Manual did not require giving the point-of-sale address in Box 31. They point out that section 4105.5 of the Manual requires that such information be furnished in Box 24 of Form 1500. Section 4011.8, however, states that "name and address information" from "item 8" (which the CCH manual, as well as other parts of the Manual, indicate is now Box 31) "is furnished ... as an aid in determining carrier jurisdiction and referring the claim to the servicing carrier where appropriate."

Moreover, the Manual stated that the carrier would use the information in Box 31 to determine whether it had jurisdiction over the particular claim. N.J. Prudential, Ohio Nationwide, and Illinois Blue Cross told the appellants that, based on the information contained in the Form 1500, the carrier to which they should submit the claims was New York Blue Cross, which had jurisdiction over the New York point of sale of the seat lift chairs for which the appellants sought reimbursement. As the jury necessarily concluded, the appellants intentionally made false statements in the Form 1500's they filed with N.J. Prudential, Ohio Nationwide, and Illinois Blue Cross.

### III

Patient Medical contends that prosecutorial misconduct requires reversal of its conviction. It argues that there were three major aspects of such misconduct. Patient Medical contends that the prosecutor improperly (A) developed and presented evidence with respect to Weiss' wealth and income, (B) made inflammatory comments in his opening statement and particularly in his summation with respect to the defendants' greed and interest in money, and (C) in his closing argument used an anti-Semitic description of the defendants.

A. As the government notes, in his direct testimony Weiss sought to portray himself and his family as virtually indigent and claimed that, since he had not personally profited from the alleged misconduct, he

should not be punished. Weiss testified that the salary he was "supposed to receive" from Health–Med in the 1983 fiscal year was $35,000. The prosecutor introduced Patient Medical's 1984 fiscal year tax return, which showed that in that year Patient Medical had paid Weiss $73,000. Weiss also testified that he earned $87,000 from Patient Medical in 1987 and that in that year only one person at Patient Medical earned more than he did, namely, Mr. Berkowitz, who, according to Weiss, earned $350,000. The prosecutor then referred to a filing by Patient Medical with the Securities and Exchange Commission that did not list Berkowitz in the table showing the cash compensation of executive officers.

The district court gave the jury two curative instructions that "this information is coming in as to credibility not in [as] evidence in chief," and "it's not evidence, it's only on [sic] an attack of truthfulness of other things said. It is not evidence in chief." In its second curative instruction, given after the tax return was admitted, the court explained that "what I just allowed in is not proof of how much he made, it goes to credibility. You may not use it as evidence in chief in the case, only as to credibility."

With respect to Weiss' wealth, Patient Medical contends that the prosecutor improperly questioned Weiss about the value of his house, brought out that he owned a Cadillac and a Lincoln, and noted that in 1988 he had renovated a bedroom in his house at a cost of $50,000 to $70,000.

The district court did not abuse its discretion in admitting the evidence relating to Weiss' wealth and income, and that evidence did not improperly inject the issue of Weiss' wealth into the case. The court informed the jury that this evidence related only to Weiss' credibility and did not relate to the merits of the government's case. The evidence was relevant to the issue of credibility. The curative instruction was proper; it did not unduly emphasize the issue to the jury or imply that the court vouched for the impeaching evidence. In-

deed, Gleicher's trial counsel initially had requested such an instruction.

■ B. In his opening statement, the prosecutor told the jury

You will also learn that the motive for this practice, yes there's a motive for what they did, and the motive for this practice was that the New Jersey, Ohio and Illinois Medicare carriers paid a higher rate of reimbursement for seat lift chairs than the New York carriers [sic] did. Money, that was their motive in perpetrating this scheme, money, plain and simple, greed.

. . . .

The defendants, nevertheless, continued to submit their claims to carriers located out of New York State in order to get the higher rates and make more money. Corporate greed, all too familiar in this country today.

Patient Medical quotes only the last sentence of each paragraph.

In his summation, the prosecutor made several highly critical comments about the defendants. He stated that "money is what this case is all about, money," characterized the defendants as "merchants of greed, deceit and corruption," told the jury that "[g]reed, that's what this case is about," and stated: "Money is what they wanted; greed, fraud. 'Greed is good,' that's the motto that they prepared. They didn't care about the Medicare beneficiaries and the system. They wanted that money. This program was a noble program and they shouldn't have acted that way and they shouldn't have stolen the government [sic] money."

Although, standing alone, some of this language is quite hyperbolic and inflammatory, in the context of the entire summation we cannot say that it was so prejudicial as to require reversal of Patient Medical's conviction. The prosecutor would have been well advised to have been more restrained in what he described as his rhetorical flourishes. Nevertheless, viewed in their totality and in context, his comments did not so appeal to the prejudice of the jury as to deny Patient Medical a fair trial.

The challenged prosecutorial conduct in this case was far less serious and pervasive than that in *United States v. Stahl*, 616 F.2d 30 (2d Cir.1980), upon which Patient Medical relies. There we reversed for prosecutorial misconduct a conviction for bribing an employee of the Internal Revenue Service. We concluded that the prosecutor

did in fact intend to arouse prejudice against the defendant because of his wealth and engaged in calculated and persistent efforts to arouse such prejudice throughout the trial. In addition, the prosecutor made several statements during the trial that were not supported by the evidence and may, in some instances, have been intentionally misleading.

*Id.* at 32.

The court gave examples of "the nature of the prosecutor's trial strategy—a strategy that obviously included a persistent appeal to class prejudice. Because such appeals are improper and have no place in a court room, ... we are compelled to reverse." *Id.* at 32–33 (citations omitted). These included repeated references, during the interrogation of witnesses, "to the 'Park Avenue offices' of the various participants in this drama, an emphasis that had nothing whatever to do with defendant's guilt or innocence," and during the cross-examination of the defendant, the "delving into his estimated net worth (over $20 million) and how he had managed to build up such a fortune." *Id.* at 32.

As we have indicated, any misconduct in the present case was far less serious and pervasive. Furthermore, here the evidence of guilt was strong and compelling, and the district court's curative instructions adequately corrected any possible prejudicial effect the prosecutor's statements might have had.

The determination whether there has been prosecutorial misconduct requiring reversal of a conviction "must be examined in the context of the trial to determine whether the prosecution's behavior amounted to prejudicial error." *United States v. Nerse-*

*sian,* 824 F.2d 1294, 1327 (2d Cir.1987) (citing *United States v. Young,* 470 U.S. 1, 11–12, 105 S.Ct. 1038, 1044–45, 84 L.Ed.2d 1 (1975)), *cert denied,* 484 U.S. 957, 958, 108 S.Ct. 355, 357, 98 L.Ed.2d 380, 382 (1987) and 484 U.S. 1061, 108 S.Ct. 1018, 98 L.Ed.2d 983 (1988). Considering all the circumstances here, we cannot say that a reversal is mandated.

■ C. At the beginning of his summation, the prosecutor stated:

> Now in my opening statement to you I told you that my opening was like a table of contents in a book and that it happened to organize for you and to give you an idea what was to follow. However, I didn't tell you the title of that particular book that was going to be presented to you. I'm sure by now you know the title of that book, and the title to that book is called the Merchant of Franklin Square and not New Jersey, and not Ohio and not 8600 West Bryn Mawr, Chicago.

The prosecutor also referred to "[t]he merchants of Franklin Square, that's where it was done."

Patient Medical contends that these comments constituted "a veiled appeal to religious prejudice." Noting the similarity of the phrase the "Merchant of Franklin Square" to Shakespeare's play "The Merchant of Venice," with its unflattering portrayal of the Jew, Shylock, Patient Medical contends that because the individual defendants in this case were Jewish, the prosecutor's comments improperly injected an element of anti-Semitism into the trial.

We disagree. Since the major issue in the case was whether the defendants should have filed their Medicare claims with New York Blue Cross, the carrier for the state in which the seat lift chair sales were made and which was Patient Medical's principal place of business in Franklin Square, the prosecutor's comments were but a colorful figure of speech designed to dramatize the issue for the jury.

Indeed, Patient Medical's trial counsel apparently agreed with that view. In his summation, he stated:

He [the prosecutor] calls them "Merchants of Franklin Square." I have no problem with that. They were merchants, "were," because by the government not paying they had to get out of that business. But I have no problem with the word "merchants" because they went into business to make money.

Patient Medical also alleges that there were several other instances of prosecutorial misconduct. We have examined the relevant portions of the transcript, conclude that the prosecutor's conduct was not improper, and see no need to address Patient Medical's contentions in any length.

IV

■ Patient Medical argues that the district court's allegedly inconsistent application of Rule 16 of the Federal Rules of Criminal Procedure denied it a fair trial. According to Patient Medical, the district court refused to permit it to introduce in evidence a document to impeach prosecution witness Estee Weisz, because Patient Medical had not previously given the document to the prosecution, but permitted the prosecution to introduce a document it had not previously given to Patient Medical to impeach the defendants' witness Weiss.

The court's refusal to permit Patient Medical to introduce the document followed instances of Patient Medical's failure to turn over to the government documents it intended to use as evidence. There was no comparable default by the prosecution. Furthermore, the government had no reason to anticipate using the document, in which Weiss stated that Patient Medical's staff was "highly knowledgeable in Medicare regulations," to impeach Weiss, until Weiss had testified that he was unfamiliar with the filing requirements for Medicare claims.

Considering all the circumstances, the district court did not abuse its discretion in its rulings relating to the introduction into evidence of documents that each side had not previously given to the other.

## V

Gleicher challenges his conviction under five counts (counts 4, 5, 13, 14, and 18) relating to Health–Med's filing of false claims, on the ground that he was "never an employee, stockholder, owner or salesman of Health Med."

Gleicher, however, was an officer, director, and employee of Health–Med's successor, Patient Medical. He actively participated in the filing of Health–Med claims after Health–Med ceased to operate. All the Medicare claims at issue were filed long after Gleicher and Weiss had met and at a time when both were with Health–Med's successor. Finally, the evidence showed that Gleicher and Weiss had engaged in a conspiracy from 1983 to 1986 with respect to the improper filing of Medicare claims.

The evidence supports Gleicher's conviction on counts 4, 5, 13, 14, and 18.

## VI

Finally, both appellants contend that the supervision of jury selection by the magistrate was unconstitutional in light of the Supreme Court's subsequent decision in *United States v. Gomez*, —— U.S. ——, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989), invalidating the practice. To sustain the contention, however, a defendant must "object to the selection of the jury by a magistrate." *United States v. Wong*, 884 F.2d 1537, 1545 (2d Cir.1989). *See also United States v. Ford*, 824 F.2d 1430, 1438–39 (5th Cir. 1987) (en banc), *cert. denied*, 484 U.S. 1034, 108 S.Ct. 741, 98 L.Ed.2d 776 (1988). Here, as the appellants concede, they did not so object. Accordingly, the contention is not open to them.

## CONCLUSION

The judgments of the district court are affirmed.

The stay of the judgment with respect to Patient Medical's payment of the fines pending our decision on its appeal, which we granted shortly after this appeal was heard, is vacated.